WESTERN ELECTRIC CO. v. NORTH ELECTRIC CO. et al.

(Circuit Court of Appeals, Sixth Circuit. January 12, 1905.)

No. 1,315.

1. PATENTS—SUIT FOR INFRINGEMENT—PLEADING.
    In a suit in equity for infringement of a patent the defenses of lack of invention and noninfringement cannot be made by plea, but only by answer.
    [Ed. Note.—For cases in point, see vol. 38, Cent. Dig. Patents, § 521.]

2. SAME—DEFENSES PROPERLY MADE BY PLEA.
    A defense to a suit for infringement on the ground that the patent bears date more than six months later than the notice given to the applicant of the allowance of the application may properly be taken by plea.

3. SAME—VALIDITY—ISSUANCE MORE THAN SIX MONTHS AFTER NOTICE OF ALLOWANCE.
    The provision of Rev. St. § 4885 [U. S. Comp. St. 1901, p. 3382], that "every patent shall bear date as of a day not later than six months from the time at which it was passed and allowed and notice thereof was sent to the applicant or his agent," is directory merely, since the same section allows the applicant six months after notice in which to pay the final fee; and where, by reason of the accumulation of work in the office, the patent cannot be prepared and signed after such payment within the six months, and it is therefore reallowed and issued on a later date, it will not be held void for that reason, at least at the instance of a private party in a collateral proceeding.

4. SAME — VALIDITY AND INFRINGEMENT — SPRING JACKS FOR TELEPHONE SWITCH BOARDS.
    The Scribner patent, No. 357,538, for improvements in spring-jack telephone switches, while for a combination of old devices, is for a new combination of great utility, and discloses invention. Also *held* infringed as to claims 3 and 5.

5. SAME.
    The Scribner and Warner patent, No. 488,033, for a telephone switch, based in part on the device of the prior Scribner patent, No. 357,538, was

not anticipated by such patent, and discloses invention. Also *held* infringed as to claims 1 and 3.

6. SAME.

The Scribner patent, No. 552,729, for improvements in telephone switches, .was not anticipated, and discloses invention. Also *held* infringed as to claims 2 and 4.

7. SAME—INVENTION—NEW COMBINATION OF OLD ELEMENTS.

While the mere assembling in a new organization of parts of old structures to perform the same functions in their new place that they did in the old is not invention, yet where they are so taken, and are organized in a new and useful manner, so as to produce a more beneficial result, there may be invention; and where the combination displays the exercise of intuitive skill and genius beyond that possessed and exercised by those well skilled in the practice of the art, and the discovery is of something new and useful, invention should be recognized.

[Ed. Note.—For cases in point, see vol. 38, Cent. Dig. Patents, §§ 27–30.]

Appeal from the Circuit Court of the United States for the Northern District of Ohio.

De Witt C. Tanner (George P. Barton, of counsel), for appellant. Albert Lynn Lawrence, for appellees.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

SEVERENS, Circuit Judge. The Western Electric Company complains in its bill of the infringement by the appellees of the rights secured by three several letters patent which it claims to own, namely, one numbered 357,538, granted to Charles E. Scribner, February 8, 1887, one numbered 488,033, granted to Scribner and Warner, December 13, 1892, and one numbered 552,729, granted to Scribner, January 7, 1896, all of which relate to improvements in spring-jack switches for telephone switch boards; and prays for an injunction and an accounting.

The appellees, who were the defendants in the court below, appeared, and interposed a plea, which, in substance, denied the allegation in the bill that the public had generally recognized the validity of the patent No. 357,538, and averred that the public refrained from contesting its validity because the Bell Telephone Company and the complainant in this suit claimed a complete monopoly of all telephonic inventions, and the public believed they had such a monopoly, and not because of the supposed validity of this particular patent. And, further, the plea denied that the invention of the patent had gone into extensive use, alleged that it had been anticipated, and denied infringement.

As to the patents Nos. 488,033 and 552,729, the plea alleged that they severally bear a date more than six months later than the time when notice was given by the Patent Office of the allowance of the applications, respectively. The complainant set this plea down for argument, and upon the hearing the court held the plea insufficient, and granted the defendants leave to answer, but without prejudice to the defendants' right to raise by answer the defenses made by the plea. We will observe, in passing, that, so far as this

plea relates to the patent No. 357,538, it is quite manifest that, except as to the defenses of lack of invention and noninfringement, it presented no defense to the bill, and with respect to those defenses it is also quite clear that they cannot be taken by plea, but only by answer. Walker on Patents, §§ 599, 600. Besides, a plea, to be maintainable, must present some single definite point on the maintenance of which the bill will be disposed of. Story's Eq. Plead. § 654. The plea as regards this patent is multifarious, in that it states several defenses to the bill. In fact, it covers the principal grounds of an answer.

The plea, in so far as it relates to patents Nos. 488,033 and 552,-729, would seem to be good in form. It alleges the fact that the date of each of the patents is more than six months later than the notice given to the applicant of the allowance of the application, and states the date on which such notice was given. Section 4885 of the Revised Statutes [U. S. Comp. St. 1901, p. 3382], provides that "every patent shall bear date as of a day not later than six months from the time at which it was passed and allowed and notice thereof was sent to the applicant or his agent; and if the final fee is not paid within that period the patent shall be withheld." The question thus raised is an important one, for the chief of the Issue and Gazette Division of the Patent Office, whose testimony is in the record, states that great numbers of patents have been issued, the dates of which are more than six months later than the time when notice of allowance was sent to the applicant. He states that it is the practice of the Patent Office, and has been for more than 20 years, to transmit to the patentee the notice of allowance as soon as may be after all the proceedings except the payment of the final fee have been taken, and the notice of allowance contains a requirement that the final fee be paid. On receiving the final fee within the six months, the patent issues. But on account of the accumulation of business in the office a considerable period of time must elapse, after the final fee is paid, before the patent can be prepared and signed. And when the final fee is paid so near the expiration of the six months that the office cannot have the patent ready for issue within that time, the office issues a notice to the applicant, which contains a receipt for the fee, and a formal notice that the application has been examined and again allowed. And it appears that this latter was the course of proceeding in the case of both the patents Nos. 488,033 and 552,729. In each case the final fee was paid, and notice of the reallowance mailed to the applicant within the six months after the original allowance; but the patents were dated and issued more than six months after the date of the original allowance, but shortly after the reallowance. It is contended for the appellees that these patents are therefore void. It is urged that the date of the patents is imperatively required by the statute, and that the Patent Office has no authority to adopt a practice which shall dispense with that requirement. There is some plausibility in the argument supporting this contention, but we think the weight of opposing reasons compels a different con-

clusion, and that the requirement should be regarded as directory, rather than absolutely essential. The full six months are allowed by the statute to the applicant, and it can hardly be supposed that Congress intended that this period could be cut short by the exigencies of the Patent Office. He has no power to coerce its proceedings. Delays in a public office are not generally allowed to prejudice the right of one who has performed all that the law requires of him to secure official action. The object which Congress had in view was to compel the applicant to follow up his application by the reasonable performance of the conditions precedent to the issue of the patent. If he entitles himself to have the patent issue within six months, that object is subserved. Said Mr. Justice Field, in delivering the opinion of the court in French v. Edwards, 13 Wall. 506, 20 L. Ed. 702:

"There are undoubtedly many statutory requisitions intended for the guide of officers in the conduct of business devolved upon them, which do not limit their power, or render its exercise in disregard of the requisitions ineffectual. Such, generally, are regulations designed to secure order, system, and dispatch in proceedings, and by a disregard of which the rights of parties interested cannot be injuriously affected. Provisions of this character are not usually regarded as mandatory, unless accompanied by negative words importing that the acts required shall not be done in any other manner or time than that designated."

And in 2 Sutherland, Stat. Construction, § 612 (2d Ed.), it said:

"In other words, as the cases universally hold, a statute specifying a time within which a public officer is to perform an official act regarding the rights and duties of others is directory, unless the nature of the act to be performed or the phraseology of the statute is such that the designation of time must be considered as a limitation of the power of the officer."

Again, the statute declares that, if the final fee is not paid within the six months, the patent shall be withheld, but it does not declare that, if not dated as directed, the patent shall not issue, or, if issued, shall be void. Besides all this, the officers charged with the administration of the law have for many years construed the law as giving power to the office to exercise control over applications until the patent should finally issue, and that it was justified in resorting to a matter of form in order that the right of the citizen should not be sacrificed. So far as we know, this is the first time the practical construction of the statute now called in question has been challenged, and much disturbance of things supposed to rest on solid foundations would ensue if such an objection should be sustained.

Whether the practice, if promptly challenged by the government in a direct proceeding to recall a patent would be sanctioned, we have not now to consider. We think the patents ought not to be held void for irregularity, if it be such, at the instance of a private party in a collateral proceeding.

Pursuant to the leave granted, the defendants answered the bill. They denied that the inventions covered by the several patents were new, alleged numerous anticipations, denied in general the validity,

of the patents, renewed their objection to the patents on account of their dates, and also denied infringement. The case went to hearing on pleadings and proofs. The bill was dismissed, but upon what grounds the record does not disclose.

The patent to Scribner, No. 357,538, was granted for an improvement in spring-jack switches such as were described in a former patent to the same patentee. He states that the object of his improvement is to "so construct the switches that they may be light, strong, and efficient, and easily accessible for adjustment or repairs, while occupying the smallest possible space upon the switch board." In telephone switch boards such switches are employed for the purpose of opening and closing the circuits between the patrons, and the switches are necessarily numerous. In order that as many as possible may be brought within the reach of an operator, it is important that they be compactly arranged in the switch board. The switch jacks shown in this and the others of complainant's patents occupy a space at the outer end of about one-half inch square and in length about two inches. They are arranged side by side on plates each of which contains say 20 switches, and these plates of switches are multiplied laterally, and are laid up one on top of the other to the height desired. The front edge of these plates is in the face of the switch board, and an opening in the front of the plate or frame extends back into the switch, through which opening the plug at the end of the connecting piece held by the operator is passed in to make contact with the springs of the jack, the springs being conductors in the circuit. Normally, the springs effect a closure of the circuit in the jack. But when the plug is inserted, and the springs are moved away from their normal contact, the circuit in the jack is opened and extended through the plug to the line connected therewith.

Fig. 1 of the patent No. 357,538, here shown, illustrates the invention patented:

*Fig 1*

The plate, a, contains several slots for receiving the switches. Two switches are inserted in their places. The lower one of the two is in its normal condition. The upper one shows the plug inserted in the jack and lifting the spring, g, off the contact piece on the spring below. The spring, f, has a ground connection, and is insulated

from the test-strap, e, and the latter is in connection with the test-tube, d, which makes contact with the tip of the plug, as the operator begins the insertion. The frame is of rubber or some non-conducting material, and so are the insulating strips shown in black. The spring, strap, and insulating strips compose the jack, and are made to completely fill the slot in the frame at the rear end thereof when all are pressed down edgewise to their place. The test-strap connection with the test-tube enables the operator to find out, through the test-wire with which it connects at the rear, whether the line is in use or not. The springs and strap are all made of thin conducting material, to economize space. This explanation is not of all the characteristics of the switch jack, but is sufficient to an understanding of the claims involved.

The claims of this patent which are said to be infringed are the third and fifth, as follows:

"(3) In a spring-jack switch, the combination, with the strap, e, connected with the test-piece at the front of the board of the ground-piece, f, and the lever, g, said strap, ground-piece, and lever being punched out of sheet metal and placed in substantially parallel planes and insulated, substantially as shown and described."

"(5) The combination, with the rubber frame or support provided with the holes and slots, of spring-jack switches inserted therein and completely filling the slots at the rear, whereby the teeth or sections of said frame are rigidly supported, substantially as shown and described."

A great number of patents had been issued in this country and abroad for switch jacks in telephone and other electrical apparatus before Scribner devised the switch jack above described. The defendant's counsel say that every element employed by Scribner is to be found in the prior art, and in structures already patented, and that there was no invention in reassembling them to perform their accustomed functions in another organization. And we have no doubt that the fact is thus correctly stated. But we do not think the conclusion follows; for, while all the things employed by Scribner and their capacities had been known to those familiar with the general subject and in some forms and relations had been applied to effect similar purposes, yet no combination of them operating in the same way as that of Scribner's is shown to have ever existed. An examination of the older devices would only show that the concession we have made is justified. And it would also show that the more recent of the prior patents for such devices have rested upon distinctions in the methods of combination. But the patent under consideration is for a new and improved combination and we are convinced it is one of much utility. Being only for an improvement, the patent must be so limited as not to cover any combination shown by the prior art. But, when so limited, it is manifest that the defendant company infringes it. As it does not build upon the older models, but copies that of the complainant's, it bears witness to the value of Scribner's improvement. We shall recur to this subject after the examination which we propose to make of the other patents described in the bill and claimed by the complainant.

Patent No. 488,033, issued to Scribner and Warner, was for a form of construction based in part on the Scribner invention, already considered, and consisted in the application of it to metallic circuits with certain necessary additions and changes. It was stated in the application that the object of the invention was to provide ready means of looping or connecting together such circuits. It included a switch jack proper and the plug to operate it.

Fig. 3 illustrates the switch jack, and a part of Fig. 7 the opening in the frame in front of the jack, and the loop-plug.

Fig. 3.

Fig. 7.

In Fig. 3 a plate is shown having spaces, 1, 2, 3, 4, 5, for five jacks laid side by side. Three of the spaces are filled with jacks. The invention consisted of the two springs, preferably of different lengths, adjusted to press normally toward each other and upon different contact points (the posts c and d), a guide-tube in front of the ends of the springs; and a loop-plug, g, is shown in Fig. 7, adapted to be inserted in the tube and to spread the springs, which are line terminals, apart so as to separate them from their normal contacts, c, d, and closing each spring with a different terminal in the loop-plug. The loop-plug has a metallic sleeve larger than the tip of the plug, and when the plug is inserted one of the springs is pressed

off its contact and comes in contact with the sleeve through which the circuit is extended when the other end of the loop is connected with the line beyond it by a similar plug and switch. The loop-plug also presses off the other spring from its contact, and, the tip of the plug being in contact with that spring, another circuit connection is formed and extended through the plug. Proper insulation is provided throughout the apparatus described.

The claims of the patent involved in the present controversy are the first and third, as follows:

"(1) A circuit-changing device consisting of two springs or line-terminals, each spring adjusted to normally press against a different contact-piece, and a tube or guide placed in front of said springs, in combination with a loop-plug having a tip smaller than the metallic sleeve of the shank thereof, said loop-plug being adapted to be inserted in said guide to separate said springs from their contacts, respectively, while each spring is at the same time closed to a different terminal of the loop-plug."

"(3) In a circuit-changing device, the combination, with two insulated springs of different lengths, having their free ends in the same direction, of a guide in front of said springs and a plug provided with two terminals, one terminal upon the tip and the other upon the shank thereof, whereby on inserting the plug into the guide the springs are respectively closed to different terminals of said loop-plug, the shorter spring being closed upon the tip and the longer spring upon the sleeve, substantially as and for the purpose specified."

Anticipation of this invention is claimed by the defendants upon similar grounds as those raised against the former patent to Scribner, which has been already considered; and that patent is itself relied upon as an anticipation of Scribner and Warner's. But this patent seems much less open to the defense of anticipation than the Scribner patent; for, although the elements employed in this invention and some of the details of methods of arrangement in respect of some of those elements are to be found in many former structures, there is nothing in the proof that shows the same combination, or anything similar to those of the patent under consideration. The reference to the Scribner patent, No. 357,538, as an anticipation, is unavailing. It is true that the means employed in that patent are to some extent utilized. There are similar springs, a plug, and a similar method of opening the circuit and of extending it. But it has not the test-strap of the Scribner combinations, nor are the normal contact-points the same. Besides, this patent has special provisions not only in the switch jack proper, but in the loop-plug also, and relatively to each other, for changing and extending the circuit, while nothing of the kind is shown in the former patent to Scribner. But, even if it had adopted the Scribner invention, the improvement upon it would nevertheless be patentable.

The Scribner and Warner invention appears to us to be of very considerable merit, and a marked improvement upon anything before attained. We have no doubt whatever of the patentability of the claims relied upon. Nor can there be any doubt, as we should suppose, that infringement is proven. The grounds for this latter conclusion will be stated when we have reached our conclusion in regard to the other patent involved in the controversy.

Patent No. 552,729 to Scribner had for its object the provision of an improved frame for switch jacks, compact and durable switch jacks suitable for use with metallic circuit lines and for controlling the continuity of both limbs of such circuits, and whose contacts should be accessible for testing the insulation and continuity of the circuit wires. The existing state of the art on which he proposes his improvements is rehearsed by the patentee as follows:

"In telephone switch boards of the multiple type it is usual to provide a spring jack or terminal socket upon each section of the multiple switch board for each line. The first spring jack of the series is arranged in the form of a switch which is adapted to disconnect the remainder of the circuit through the switch board. The long-distance connections or other connections requiring the highest insulation and greatest freedom from disturbance are made with this first spring jack of the series by means of the usual loop-plug, in order to free the line from the disturbances arising from cross-talk or induced currents taking place in the cables of the switch board, and the shunting effect of the annunciator which is permanently connected with the switch-board circuit. The necessity also frequently arises of testing to locate defects upon the line, which defects may be either in the switch board or upon the line circuit, and such tests have been provided for by a second switch in the line or switch-board circuit adapted to open the line circuit in order that the circuit through the switch board and that through the line might be separately tested. The spring-jack switches have usually been arranged in groups, of twenty, the different members of the group being mounted upon a common base-plate, the aggregation being denominated a 'strip of spring jacks.'"

The purpose of the invention was to provide a simple and durable strip of spring-jack switches having contact-points not only adapted to make connection with the corresponding portions of ordinary connecting plugs, but which are also accessible for testing by means of a special testing plug provided for the purpose, whereby separate circuits may be closed through the switch-board circuit and through the line circuit simultaneously. The spring jack is also provided with local contact pieces which are connected with the annunciator for the purpose of restoring it and for testing purposes.

The frame specially devised for this patent is shown in part by Fig. 7 here reproduced:

*Fig 7.*

It is made of hard rubber or other insulating material. The recesses for the jacks are narrowed at the rear end for about one-third of their length, so that they may pinch and hold tight the springs of the jacks when pressed into them with their insulating strips between. Forward of this holding place the space is made

wider, to give play to the springs; and forward of this wider space is an opening extending through to the front of the plate to receive the plug when pushed into the jack.

A part of Fig. 1 shows the arrangement of the switch jacks in a part of the frame, and also shows the springs in their relation to each other and their insulations (in black):

Fig. 16 shows the plug and its relations to the springs of the jack and the connecting wires:

This plug is provided with several contact-points, which, with the springs when they come in contact therewith, close the circuit, which is extended thereby through the plug to another line or limb of a line. It (the plug) is a somewhat complicated and ingenious affair, performing functions all of which are not involved in the present suit. We have only to deal with the organization of the frame and the switch jacks and the adaptations of the latter to the plug. By referring to Fig. 16 it is seen that each jack comprises a pair of line-springs, b, b', and their co-operating switch contact-anvils, c, c'. The springs, c, c', are connected with the limbs of the circuit through the remainder of the telephone exchange, including the annunciator, and they are adapted to contact with points on the tip of the plug when the latter is pressed in and has separated the main line springs from their contact with the springs, c, c'.

There are 11 claims in this patent, but only the second and fourth are claimed to be infringed. They are as follows:

"(2) The combination with a plate of insulating material having transverse grooves in one face and a plug-opening from the edge of the strip into the

transverse groove, of line springs placed on edge and forced into the groove, the springs being separated by an interposed tongue of insulating material, substantially as described."

"(4) The combination with the plate, a, having the grooves, a', formed in it, of the line springs, b, b', and their contact springs, c, c', separated by interposed tongues of insulating material, forced on edge into the groove, substantially as described."

Nothing in the prior art is shown to us which anticipates these claims. We might properly repeat the observations we have made regarding the conditions existing at the date of the other patents as correctly stating the conditions existing at the date of this invention; that is to say, no such combinations of means are to be found in the prior art. All three of these patents may well stand upon the rule which has several times been affirmed in this court, namely, that while the mere assembling in a new organization of parts of old structures to perform the same function in their new place that they did in the old is not invention, yet where they are so taken and are organized in a new and useful manner, so as to produce a more beneficial result, there may be invention; and when the combination displays the exercise of intuitive skill and genius beyond that possessed and exercised by those well skilled in the practice of their art, and the discovery is of something new and useful, invention should be recognized. As we have already indicated, we think that each of these patents shows a distinct advance in the progress of the art with which it is concerned. And the number of patents relating to this subject which had been taken out is strong evidence that the results which had already been reached had already exhausted the common skill and learning of the craft.

With respect to the matter of infringement, the defendants North and Steele are not shown to have been individually guilty of any infringing act. There is therefore no excuse for joining them as parties, unless it be that they were officers of the offending corporation, and this is no excuse. It may be, however, that the complainant mistakenly supposed the officers were active participants in the infringement, and has been disappointed in its proofs. However this may be, the bill was properly dismissed as to them, and so far the decree of the Circuit Court will be affirmed, with costs of both courts to those defendants.

As to the corporation, the charge of infringement is clearly proven. The claim that it built upon old structures, known to the public before the inventions of the patents in suit, is groundless. Its manufacture resembles the older art only as the complainant's does. The only difference between the manufacture of the defendant and that of the complainant's patents which has been pointed out in the thorough and elaborate argument of counsel for defendants, or that we have been able to discover, that deserves to be mentioned, is this, which has reference to that element of the combinations of the last patent termed the "frame" or "plate," which in that patent is described as made of hard rubber or other insulating material. The defendant's frame or plate has a floor made of alu-

minum, upon which are mounted the parts which support the switch jacks and bind them at the rear, which, as well as all the other parts of the frame except the floor, are made of hard rubber; and it comes to this: that all the parts of the defendant's frame whereof the kind of material is of any consequence is the same as the complainant's. The frame is in all substantial respects the equivalent of the Scribner frame.

The decree of the Circuit Court must be affirmed, with costs as to the defendants North and Steele, and reversed as to the defendant North Electric Company, with costs to complainant in the Circuit Court and in this court, and the cause remanded, with directions to enter a decree for the complainant against that defendant and for further proceedings therein. The decree will not include an order for an injunction in respect to any of the complainant's patents which have expired at the time of entering such decree.