BURDETT-ROWNTREE MFG. CO. v. STANDARD PLUNGER ELEVATOR CO.

(Circuit Court, E. D. Pennsylvania. December 13, 1911.)

No. 3.

PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—ELECTRIC ELEVATOR.

The Rowntree patent, No. 666,699, for a signaling system for electric elevators, which enables a single person at the motor to control their movement, covers a new combination and arrangement of known elements, resulting in greatly improved operation and discloses patentable invention; also *held* infringed.

In Equity. Suit by the Burdett-Rowntree Manufacturing Company against the Standard Plunger Elevator Company. On final hearing. Decree for complainant.

See, also, 197 Fed. 743.

Charles M. Nissen and Frank T. Brown, for complainant.

J. S. Wooster and C. V. Edwards, for defendant.

J. B. McPHERSON, District Judge. The patent in suit, No. 666,-699, was granted January 29, 1901, for an improvement in electric elevators—not in all electric elevators, however, but only in those that belong to " * * * the type wherein, when the elevator-hoisting motor is set in operation, it will be automatically arrested when the

car reaches a predetermined stopping point or landing. * * *"
And not in all automatic electric elevators either, for it is to be noted
that the invention obviously does not apply to an elevator that carries
persons—either to a passenger elevator, or to a freight elevator car-
rying its own operator—but solely to an automatic elevator that car-
ries nothing but freight. "Dumb-waiter" is a colloquial name for the
class, and to this class the patent must be restricted. And it should
be noted further that the sole object of the invention is "to provide a
signalling system for (such) electric elevators. * * *"

In a word, instead of a system in which the movement of the car is
controlled either from the car itself or from any floor along its path,
the patent offers a system in which every such movement is controlled
by one person only, and at one place only, namely, by the motor at-
tendant, and at the motor itself. A convenient name for the system,
although the name is not used in the patent, is the phrase "one-point
control." In order to accomplish the object of the patent, three sys-
tems of signals are used—the call, the floor-bell, and the door or lamp
system.

The claims insisted upon deal with the call signals in the first group,
Nos. 1, 2, 3, 5, and 7:

"1. In an automatic elevator, a hoisting mechanism, means for controlling
the same, said means operating to start the car and to arrest it automat-
ically at any predetermined landing, a push-button for each floor at which
the car is to stop, a circuit for each push-button, and a signal, actuated by
the operation of each push-button, for signifying in advance of the starting
of the car the floor at which the car is desired to stop, as and for the pur-
pose set forth.

"2. In an automatic electric elevator, a hoisting mechanism, means for con-
trolling the same, said means operating to start the car and to arrest it
automatically at any predetermined stopping point, a signal corresponding
to each floor or landing at which the car is to stop, and arranged to indicate
to the hoisting-mechanism attendant in advance of the starting of the car
the floor at which the car is to stop, a circuit for each signal, and a push-
button arranged in each signal circuit, as and for the purpose set forth.

"3. In an automatic electric elevator, a hoisting mechanism, means for
controlling the same, said means operating to start the car and to arrest it
automatically at any predetermined stopping point, signals arranged adja-
cent to the said controlling means to indicate to the attendant the manner
of control of the hoisting mechanism to cause the car to proceed to any
particular floor or landing, a circuit for each signal, and a push-button ar-
ranged to each floor or landing, each push-button controlling a signal-circuit,
as and for the purpose set forth."

"5. In an automatic electric elevator, a hoisting mechanism, means for con-
trolling the same, said means operating to start the car and to arrest it au-
tomatically at any predetermined landing, a signal corresponding to each
landing at which the car is to stop, a push-button arranged at each floor,
each push-button controlling the circuit of its corresponding signal, whereby
the hoisting mechanism attendant may be notified in advance of the opera-
tion of said controlling means to send the car to any floor, as and for the
purpose set forth."

"7. In an automatic electric elevator, a hoisting mechanism, means for con-
trolling the same, said means operating to start the car and to arrest it au-
tomatically at any predetermined stopping point, a series of 'Send' signals and
a series of 'Call' signals, said 'Send' and 'Call' signals being arranged in prox-
imity to the controlling means, a circuit for each signal, a push-button ar-
ranged at each landing for controlling the circuit of the 'Call' signal cor-
responding to that floor, and push-buttons arranged to control the circuits of
said 'Send' signals, as and for the purpose set forth."

The floor-bell signals appear in the second group, Nos. 9, 10, and 11:

"9. In an automatic electric elevator, a hoisting mechanism, means for controlling the same, said means operating to start the car and to arrest it automatically at any predetermined landing, a signal arranged at each floor, said signals operating respectively to indicate that the car requires attention at the particular floor at which it is located, a push-button for controlling said signal, said push-button being arranged in convenient relation to the controlling means, as and for the purpose set forth.

"10. In an automatic electric elevator, a hoisting mechanism, means for controlling the same, said means operating to start the car and to arrest it automatically at any predetermined landing, a signal arranged at each floor or landing, circuits for said signals, and a push-button arranged in convenient relation to the controlling means for controlling the circuit of each signal, as and for the purpose set forth.

"11. In an automatic electric elevator, a hoisting mechanism, means for controlling the same, said means operating to start the car and to arrest it automatically at any predetermined landing, a series of signals arranged in convenient relation to the controlling means, means arranged at each landing for controlling the circuits of said signals, in combination with a signal arranged at each landing, circuits for said landing-signals, and means, also arranged in convenient relation to the controlling means, for controlling the circuits of said landing-signals, as and for the purpose set forth."

And the door or lamp signals appear in the third group, Nos. 12, 13, 14, 15, and 17:

"12. In an elevator, a hoisting mechanism, means for controlling the same, said means operating to start the car and to arrest it automatically at any predetermined stopping point, a signal device arranged in convenient relation to said controlling means, a circuit for said signal device, a switch arranged at each landing of the elevator shaft, each switch adapted to be closed when the elevator shaft or well door is closed, and to be opened when such door is opened, as and for the purpose set forth.

"13. In an elevator, a hoisting mechanism, means for controlling the same, said means operating to start the car and to arrest the same automatically at any predetermined stopping point, a door at each floor at which the car is to stop, a switch operated by each door, a signal device arranged in convenient relation to said controlling means, said signal device controlled by the door-switches for signaling the motor attendant, in advance of the actuation of said controlling means, whether the doors are opened or closed, as and for the purpose set forth.

"14. In an automatic elevator, a hoisting mechanism, means for controlling the same, said means operating to start the car and to arrest it automatically at any predetermined landing, a signal arranged adjacent to the controlling means, a circuit for said signal, a switch arranged at each floor or landing, said switches arranged in said signal-circuit, and each switch adapted to be opened or closed, according as the elevator shaft or well door is opened or closed, in combination with a signal for calling attention to the door being open in advance of the operation of the controlling means, and means arranged adjacent to the controlling means for closing the circuit of such signal, as and for the purpose set forth.

"15. In an automatic elevator, a hoisting mechanism, means for controlling the same, said means operating to start the car and to arrest it automatically at any predetermined landing, a signal arranged in convenient relation to the controlling means, a circuit therefor, a switch arranged at each landing and included in said signal-circuit, each switch adapted to be controlled by the door at such landing, in combination with a signal arranged at each landing, a circuit for each signal, and a push-button arranged in convenient relation to the controlling means for controlling the circuit of each landing-signal, as and for the purpose set forth."

"17. In an elevator, a hoisting mechanism, means for controlling the same, said means operating to start the car and to arrest it automatically at any predetermined stopping point, an auxiliary switch actuated coincidently with

the setting in operation of the hoisting mechanism, a signal arranged in convenient relation to the controlling means, a circuit for said signal, said circuit arranged to be controlled by said auxiliary switch, whereby when the car is in motion the fact will be indicated, as and for the purpose set forth."

These are all combination claims, and the fundamental question in the case, the only question that really needs consideration, is whether the patented device is a true combination or a mere aggregation of elements. Every element is old, and the defendant contends that no invention can possibly be involved in arranging old and well-known signals in close and convenient proximity to an old and well-known motor. But in my opinion the argument may be satisfactorily answered. It is true that the line between a combination and an aggregation is not always easy to draw, and it is also true that the case before us may lie within the twilight zone, but the balance of my judgment is in favor of the patent. The device has proved to be useful. It is an obvious advance on any previous arrangement of signals and motor. It saves much time both of employés and of the elevator. It prevents interferences and struggles between different floors over the control of the car. In several particulars it reduces greatly the danger of operation, and it distinctly promotes efficiency in gathering and transporting goods. These solid advantages are well established, and, as I think, are enough to decide the dispute. It must be conceded that in the last analysis the patent does not do much more than move signals from one place to another without changing their function, but in doing this a real contribution has been made to the art, and a contribution I think of considerable value. By the grouping and arrangement that are said to be merely aggregation, it seems plain that an intimately related whole has in fact been evolved, in which each part has been made more effective to accomplish the common object, and in which this increased efficiency is due to the new relation of each part to the others. The total result is certainly greatly improved in the several particulars already referred to; and, while it is not a tangible product that has been improved, the new method of operation produces a clearly perceptible advance in the art. Elevators with one-point control arrangement of signals and motor are operated more rapidly, more easily, more safely, and more efficiently, and this greatly improved operation seems to be a new and beneficial result produced by a new combination and arrangement of known elements within the meaning of the language used in Loom Co. v. Higgins, 105 U. S. 580, 26 L. Ed. 1177. See, also, Nat., etc., Co. v. American, etc., Co., 53 Fed. 367, 3 C. C. A. 559.

The successive operation of the signals and of the motor is not a decisive objection; and the necessary intervention of human agency is equally unimportant. A device need not be wholly automatic before it can be protected by a patent, nor need all its movements be simultaneous. "The test is whether there is a new unitary result, to the production of which the different elements co-act." Novelty Glass Manufacturing Co. v. Brookfield (C. C. A., 3d Circuit) 170 Fed. 946, 95 C. C. A. 516, and I think that test may safely be applied in the present case. The result produced by the patent is a method of operation, safer, simpler, more efficient, and more economical, and in my opinion invention was required to contrive the means of producing it.

It may be that the patented system is inferior to the defendant's installation in one particular at least—perhaps in others also—but that fact alone is not a satisfactory answer to the charge of infringement. Powell v. Leicester Co., 108 Fed. 386, 47 C. C. A. 416; Cochrane v. Deener, 94 U. S. 780, 24 L. Ed. 139. The defendant may have improved upon the patent here or there, but I do not think the denial of infringement is relied upon with much confidence, if the main defense —that the plaintiff has patented a mere aggregation—is not sustainable. It is more than probable that Mr. Dunn, who left the plaintiff's service to enter the defendant's, took with him ample knowledge of the plaintiff's system, and used it in the manufacture of the defendant's device. Regina, etc., Co. v. Paillard (C. C.) 85 Fed. 644; Kelsey Co. v. Spear Co. (C. C.) 155 Fed. 976; Spirella Co. v. Nubone Co. (C. C.) 180 Fed. 470. Neither is it worth while to spend time over the prior art, for this plainly contains no such combination as the patent shows.

Claim 1 is perhaps drawn too broadly, and I do not find it necessary to pass upon its validity, but a decree may be entered sustaining the other claims hereinbefore quoted and finding infringement.