### JACKSON FENCE CO. v. PEERLESS WIRE FENCE CO.

(Circuit Court of Appeals, Sixth Circuit. December 7, 1915.)

No. 2772.

1. PATENTS ☞51—ANTICIPATION—"THAT WHICH INFRINGES IF LATER," ETC.

Although an invention is made for use in a particular business, yet, if the claims are not limited thereto, the field of prior art must be as broad as the field of infringement, and anticipations or limitations may be looked for in any art within the scope of the invention as fixed by the claim.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 66–69, 72, 74; Dec. Dig. ☞51.]

2. PATENTS ☞26—INVENTION—PROBLEMS PECULIAR TO ONE USE.

Even though claims may not be limited to one application of a device, the problems peculiar to that application may bear on the existence of invention.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 27–30; Dec. Dig. ☞26.]

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. PATENTS ⊚═○328—INVENTION—AGGREGATION—VALIDITY AND INFRINGEMENT —STAPLE MACHINE.

The Hoxie patent, No. 879,965, for a staple forming and discharging mechanism, *held* to involve invention, not aggregation. Claims 2, 3, 7, and 12 *held* infringed.

4. PATENTS ⊚═○167—VALIDITY—SUFFICIENCY OF SPECIFICATION.

A patentee is entitled to the benefit of every function within the scope of the claims and actually possessed by his mechanism, even if he does not know of it at the time of patenting, and it is not necessary that he should enumerate its advantages.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 243; Dec. Dig. ⊚═○167.]

5. PATENTS ⊚═○101—CLAIMS—FUNCTIONAL.

A claim is not invalid, because functional, if it is not beyond the broadest equivalency of which the real invention permits.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 141; Dec. Dig. ⊚═○101.]

Appeal from the District Court of the United States for the Eastern District of Michigan; Arthur J. Tuttle, Judge.

Suit in equity by the Peerless Wire Fence Company against the Jackson Fence Company. Decree for complainant, and defendant appeals. Affirmed.

For opinion below, see 226 Fed. 774, —— C. C. A. ——.

The Peerless Company, as owner of patent No. 879,965, issued February 25, 1908, to Vernon Hoxie for "staple forming and discharging mechanism," brought against the Jackson Company the usual form of infringement suit in equity based on defendant's use of the supposed infringing device in a machine or loom for making wire fence. The defense was that upon the proper construction of the claims there was no infringement, and that, if they were construed broadly enough to cover defendant's device, they were invalid. The District Court found with the plaintiff on these issues, and the Jackson Company appeals from the interlocutory decre for injunction and accounting. The claims involved are 2, 3, 7, 9 and 12, quoted in the margin.[1]

---

1Claim 2. In a staple machine, an incasing member having a fixed staple-forming part, a non-rotatable plunger having a staple-forming part and a staple-discharging part disposed in intersecting planes, the staple-forming part, co-operating with the fixed staple-forming part to form·a staple, and a pressure block operative to eject the formed staple from said fixed part to permit it to move into position to be engaged by the discharging part.

Claim 3. In a staple machine, an incasing member, a plunger having a staple-forming part and a staple-discharging part disposed in intersecting planes, a fixed portion within the member with which the forming part co-operates to form a staple, and a pressure block U-shape in cross-section which straddles said fixed portion and effects an ejectment of the formed staple therefrom at a predetermined point in the movement of a plunger to permit the staple to move into position to be discharged.

Claim 7. In a staple machine, an incasing member, a portion in said member about which a staple is formed, forming and discharging parts operative in said member to simultaneously act on a section of wire fed thereto to shape it about said portion and to discharge a previously formed staple from said member, said parts being relatively positioned to cause a staple to have a lateral circular movement in moving from its forming to its discharging position, and means for ejecting a formed staple from said portion when the forming and discharging parts have receded from their forming and discharging positions.

Claim 9. In a staple machine, an incasing member, a portion in said member about which a staple is formed, a tool operative in said member to form and discharge a staple, the forming and discharging parts thereof being relatively positioned to cause a staple to have a lateral turning movement in moving from one to the other, means for ejecting a formed staple from said portion, and means for causing a staple to have a turning movement as it moves by gravity from one to the other of said parts.

Claim 12. In a staple machine, an incasing member, a fixed staple-forming part in said member, mechanism co-operating with said fixed part to form a staple and operating to discharge a formed staple from the member, the forming and discharging parts of

Both parties are engaged in the making of wire fence, and the devices in question are put to practical use for that purpose. In machines of this class, sometimes called looms, because the output approximates a woven fabric, the continuous strand wires, which will be horizontal when the fence is erected, are spaced apart and properly fed intermittently through the machine. At suitable intervals, the stay wires which will, in final use, be vertical, are placed across the strand wires, and at each point of intersection a staple is driven, and its legs are so directed that it will form a tie about the intersection. At the moment of this operation, the intersection of wires lies upon an anvil die which may be supplemented by a die connected with the staple-driving mechanism; but we are now concerned only with the device which drives or ejects the staple out of its guiding ways. The ejecting device is in the form of a flat blade, shaped at its forward end to fit the crown of the staple and forcing the latter along in its guiding slot or way until the point of ejection is reached. The plane of the staple may be thought of as having two kinds of axes; one a longitudinal axis parallel with the legs, located in either leg or anywhere between them, and the other a lateral axis at right angles to the longitudinal axis and located anywhere between the crown and the end of the legs. In the manipulation of the staple in its feeding process, it may revolve upon a longitudinal axis, or it may tilt upon a lateral axis. In a fence loom, the stay wires are horizontally disposed, as the fabric passes over rollers in front of the operator. It may be moving upward or to the rear or in any intermediate direction and, accordingly, the driving plunger may move horizontally rearward or vertically downward or on an intermediate angle. The plane of the driving plunger blade and its carried staple (which obviously must be the same) may be disposed in any desired relation to the plane of the fabric and to its line of travel—all according to the nature of the tie and the position and shape of the anvil die. The form shown and described in the patent in suit drives the staple at an angle of about 45° from the horizontal; but with regard to the functions here involved it may be considered as of the horizontal type.

For rapidity of operation the fence loom has a battery of such plungers and anvils side by side in front of the operator, so aligned and spaced that all the ties along one stay wire are formed simultaneously, and thus, with each plunger stroke and the synchronous motions, the machine intermittently delivers a completed section of the fence. In earlier devices of this class, staples were formed and conveyed to the ejecting plunger by two methods. In the first method, the staples were manufactured by separate machines and from them carried to the driving machine. From the point of ejection, an upwardly inclined bar led away at right angles to the plane of ejection. The staples were manually placed straddling and hanging upon this, and by gravity they slid down upon it as a carrier, so that as the plunger blade on its rising stroke was lifted above the lowermost staple, that one would drop forward into the groove of the plunger blade and be driven by the next descending stroke. In some cases, this carrier bar started toward the operator at right angles to the lateral axis of the driven staple, and after leading in that line for a short distance. was bent in the arc of a circle, perhaps as much at 90°; and it followed that the staples, sliding down along this curved bar, were caused to revolve upon their longitudinal axes in order to get them parallel to the driving plane. In the instances where such a curved bar was used, its bending was simply matter of convenience to get the longer and projecting part of the feed bar where it would be most out of the way. Not only had such bars been so curved that the staples would revolve on their vertical axis in their travel, but in other cases the staples in entering upon or leaving the feed bar had been tilted on their lateral axis for the same purpose—to get them parallel with their discharging plane, so that they would easily feed into that plane. The other method consisted in feeding a continuous wire into what may be called the head of the driving machine, and providing therein two parallel plunger blades both operated simultaneously by a common driving head, and so arranged that the first would sever a section of the wire and form a staple

said mechanism being relatively positioned to cause a staple to have a lateral turning movement to move from forming to discharging positions, and non-rotatable means for causing a staple to turn from one position to the other after being formed.

with the same descending stroke by which the second blade was ejecting the previously formed staple, and then that the staple so formed would be suitably fed to the ejecting blade.

C. C. Linthicum, of Chicago, Ill., for appellant.

Wilbur Owen, of Toledo, Ohio, for appellee.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

DENISON, Circuit Judge (after stating the facts as above). [1] In this recital of the prior art, we have not confined ourselves to fence-making machines; but we have extended it, as we think it must be, to include all machines that form or eject or form and eject staples. This is for the reason that, though the proof shows the invention was made by a man engaged in the fence-making business, and for the purpose of being used in that business, yet he deliberately sought and obtained a patent which contained no such limitation. He entitled his device "staple forming and discharging mechanism," he said that it was not restricted to use in connection with fences, but "may be used in any connection for which it may be adapted or appropriated," and his claims all pertain to "a staple machine." The field of prior art must be at least as broad as the field of infringement; and it follows that for anticipations, as well as for the sum of existing knowledge, we may look among machines for making or driving staples in the manufacture of boxes, or shoes, or brushes, as well as in the making of fences. These things are not in analogous arts; they are in the same art which the patentee has selected as fixing the scope of his patent. This is only an application of the familiar rule that whatever infringes if later, anticipates if earlier.

[2] It does not follow that the peculiar problems pertaining to fence making have no bearing in deciding the existence and character of Hoxie's supposed invention. The same type or class of device finds different environment as it has different applications; the application in one instance will present problems that do not exist elsewhere, and the solution of which may be invention just because of the environment existing in that particular field; but the invention and the patent to be had therefor may properly extend to other fields in which its application may be worth while. We considered a somewhat analogous question in Cadillac Co. v. Austin, 225 Fed. 983, —— C. C. A. ——. The difficulty which Austin overcame existed in connection with the common use of the gear box, and, excepting for this common use, he might never have made his device, or it might not have been of much practical value. He did not include the gear box as an element of his claims, nor did we think that this element could be or should be read in so as to save anticipation; but we thought that the practical situation surrounding him was of importance in considering the question of invention. So, in the present case, a finding that Hoxie made an invention, in any sense broad enough to support a finding of infringement, must rest on the fact that he solved a problem which, so far as known, was peculiar to the fence-making business, and that his patented device is of distinct utility for that particular use. What Hoxie did, as compared with the previous fence machines, was: First,

to make his forming and driving devices in compact, unitary form, using a continuously fed wire; but this was not at all new in the field of his patent. Second, he arranged his forming and driving blades in planes having their longitudinal axes parallel, but their lateral axes at an angle to each other. This had never been done before, with the forming and driving blades of a compound plunger; it had only been done, incidentally and without purpose, as the forming and driving blades happened to be located in separate machines. Third, and last, he provided for revolving the staple on its longitudinal axis as it passed from the plane of the former into the plane of the driver, and while free from control by either. This was new, except in cases where, as above described, the staples.had been carried from the forming machine manually and placed upon a feed bar, where, as incidental to their travel, they made that revolution. Hoxie's second and third steps were correlative; if one was taken, the other must be; either one may be considered as incidental to the other.

[3] The first thought is that, instead of a useful improvement, Hoxie had devised a troublesome complication. It is simpler to form and make the staple in parallel planes, as others had done, and it would seem as though Hoxie's device was only for the purpose of correcting an initial mistake in the direction of the wire feed; but the specific field in which he was working shows a utility not otherwise visible. The wire is fed into the machine lying in the same plane in which the staple is formed, and, in the ordinary and simpler device, this means that the wire must come in from the side, and the head must be wide enough to hold, extended at length, the section of wire which is to be severed and become the staple; in other words, the machine head must be considerably more than twice as wide as the finished staple is long; if the finished staple is, e. g., to be three-fourths of an inch long, the head, in order to extend both legs and provide for the crown and for the side walls of the head, must be two inches wide. The different heads of the battery must be as far apart, center to center, as the strand wires are placed, and it is customary to bring the lower strands quite close together—so close as to leave only one inch between them. The width of the head must therefore be kept within the space of one inch, and it would be impossible within that width to form even a half-inch staple in the manner described. The depth of the head—that is, the distance from the front to the rear—involves no such limitation. It can as well be two or three inches, and so give ample room for the making of a staple in a plane at right angles to the ejecting plane and for it to be revolved, from one to the other. This is simple enough, when observed, but Hoxie was the first one to see both that it was a desirable thing to do and how to do it; and we have no doubt that his combined thinking and acting in these respects amounted to invention above and beyond the mere details of construction. Loom Co. v. Higgins, 105 U. S. 580, 591, 26 L. Ed. 1177; Diamond Co. v. Consolidated Co., 220 U. S. 428, 434, 31 Sup. Ct. 444, 55 L. Ed. 527.

Snedeker's earlier machine not only tilted the staples laterally instead of revolving them vertically, as they moved from former to

driver, but—much more important—his forming and driving mechanism were separate machines. They were mounted on the same frame, and, doubtless, had some timing relation; but they were a considerable distance apart. If they moved in unison, it was because they happened to. Either could continue at work, if the other was out of order. They were essentially distinct. They were very likely, if not certainly, within the definition of a mere aggregation. Hoxie made them unitary. One stroke of the plunger head both formed and drove. One incasing frame included all parts. The turning of the staple permitted the right-angled relation of the blades, and this relation permitted the wire to be fed in from another direction, and this permitted the manufacture of a narrow mesh fence with an automatic wire feed stapling machine—a result not attainable by any existing machine of that class except through substantial reorganization. He did more than merely to bring close together two existing machines; he combined them into one. When we consider the whole situation, the making and driving of staples in a continuous wire machine and by a compound right-angled plunger, appears to be a joint function—not an aggregate one. (See discussion of aggregation in our opinion in Gas Machinery Co. v. United Co., 228 Fed. 684, —— C. C. A. ——.)

In another earlier device, the staple was turned on its longitudinal axis by causing the driving plunger to revolve as it descended, carrying the staple. This shows that it was not new to turn the staple on this axis, but, at the most, it only furnished one of the ideas which Hoxie adapted to his much simpler plan.

[4] We do not overlook the fact that the peculiar utility which his invention is now seen to possess, and which we have described, is not stated in so many words in his specification; but there are two sufficient reasons why this omission is not important. The first is that if he had undertaken to state the practical, commercial benefits, and had omitted what afterwards proved to be the chief one, he would, nevertheless, be entitled to have his patent construed with reference to that unspoken advantage, since the patentee is entitled to the benefit of every function within the scope of the claims and actually possessed by his mechanism, even if he does not know of it at the time of patenting. Morgan Co. v. Alliance Co. (C. C. A. 6) 176 Fed. 100, 107, 100 C. C. A. 30; Kellogg v. Deane (C. C. A. 6), 182 Fed. 991, 998, 105 C. C. A. 545. The second reason is that this patent does not undertake to name any practical advantages or benefits, save, in general terms, "to simplify and improve upon the construction and apparatus of this class, whereby to enhance the practicability and commercial value thereof"; and no obligation rests upon the patentee to convert his specification into a trade circular. Its proper office is to describe the structure, and in so far as the patentee claims commercial benefits and advantages, he is giving unnecessary information. If it were important, we see no reason to think that Hoxie was ignorant of the specific advantage which has been described, viz. reducing the necessary width of the driver head. He was the superintendent of the factory in which machines of this class were in use. There is no apparent object in going to the trouble of making the two blades in dif-

ferent planes, and passing a staple from one plane to the other, except the object of reducing the width of the head, and it is rather an impeachment of Hoxie's intelligence to suppose he had any purpose, excepting this, or that he did not understand substantially the closer spacing possibility which would result. Diamond Co. v. Consolidated Co., 220 U. S. 425, 437, 31 Sup. Ct. 444, 55 L. Ed. 527.

Nor do we overlook the fact that neither Hoxie nor complainant has operated a device made in the specific form shown by Hoxie's specification and drawing. A little later he devised another method of transforming a section of wire lying at right angles to the plane of ejection into a staple lying in that plane, and of this later form there has been large practical use by complainant. We can neither hold, as complainant asks us to do, that this is a use evidencing invention, nor, as defendant asks us to do, that there has been no practical use and that the patent is only a paper patent, without assuming either that the patent does or does not cover this modified form which has been thus actually used; and we find no necessity in the present case for going far enough to reach that question.

We come, now, to the distinctions between the form shown in the patent and the form used by defendant, and to determine whether either the scope of the invention, as reflected in the claims, or limitations—even perhaps unnecessary—expressly stated in the claims show noninfringement. The striking difference between the two devices flows from the fact that the patented driver is of the horizontal type while the defendant's is vertical; consequently, in the patented form, the staple, after being shaped, lies vertically, resting upon one leg, and is then pushed so that it falls over and lies flat upon the floor. The axis of revolution is horizontal and coincident with the bottom leg. In defendant's device, the legs of the staple are always vertical, and the revolution is on a longitudinal axis midway between the legs. This revolution is caused by pushing the staple along while it straddles and rides upon a carrier leading from one blade to the other and around a 90° curve. To accomplish this result, the arc of the circle between the centers of the two blades, instead of being about one inch long, as in Hoxie, is about three inches, and the two plunger blades, instead of having their inner edges united, as in Hoxie, have these edges about one inch apart; but both are, at their upper ends, united to and carried on a common head. The fact is, as claimed by defendant, that it has used without material change one of the old curved carrier bars for delivering staples to the driving plunger; but it has united with this a forming plunger practically integral with the driver. The two are not directly united along one edge; but, like Hoxie, they form two fingers of one hand. Whether there is a web connecting the fingers is of no functional importance. We have already said that this combination involved invention; and we see no inherent reason why the scope of this invention should be confined to a revolution on the longitudinal axis when that axis is horizontal, rather than extend also to the same motion when the axis is vertical, or to staple motion resulting from gravity alone rather than to motion more largely dependent upon the direct action of other parts.

Are there, then, express limitations in the claims which differentiate defendant's structure? It will be noticed that in the patented form the chief agent in causing the staple to turn from one plane to the other is gravity. When formed, it lies on its edge, and at the right instant a spring-propelled yoke causes a slight push which moves all of it laterally out of the plane of the forming blade, and also causes it to fall over flat on its side. This spring push block has not been described because it is common to the old art and to the devices of both parties. The patent also provides a development of the forming anvil into a flat bar which the staple straddles as it revolves and falls, and which bar is along the arc of the circle followed by the center of the crown in its falling motion. This central curved guide assists in the revolution in that it holds the staple from slipping back into the forming plane from which it has been pushed, and accurately positions the staple as it turns and as it lies on the floor at the end of the turn, and its office is, in part, though not wholly, the same as the office of the curved carrier bar in defendant's form. In the latter form, gravity plays a subordinate part in the revolving motion. In so far as the carrier bar is downwardly inclined, the forward travel of the staples along the bar is assisted by gravity; but with each reciprocation of the machine there comes a lateral push from the starting point, and apparently the staples would be delivered from one blade to the other nearly as well as if the bar were level and gravity cut no figure. We find that several of the claims not sued upon distinctly specify that the staple "falls by gravity from one position to the other," or has "a free circular falling movement from forming to discharging position," and it is said that defendant's staple does not have this motion. Claims 2, 3, 7, and 12 contain no reference to gravity as the active force, and, under the familiar rule for differentiating claims, this limitation cannot be read into these four claims.

Each claim calls for "an incasing member," and it is urged that defendant eliminates this element. To take this view is to give an unduly strict construction. The patented device has what might be considered an incasing member in that it has a completely inclosed, more or less cubical chamber, along one side of which the staple is formed, in the body of which it turns and along another side of which it is ejected; but here, again, comparison of the claims shows that this chamber is not "the incasing member" to which the claims in suit refer. In other claims, this chamber is expressly specified as an element additional to and contained in the "incasing member," and it necessarily follows that the incasing member is not the chamber, but is something else. With this broader but reasonable view, the incasing member is the casing or framework which surrounds and contains all the working parts—the machine head, which condenses into a unitary structure the two reciprocating blades, their ways, the wire cut-off, the space within which the staples turn, the curved guide, and the spring push block. In this sense, we find the incasing chamber embodied in the defendant's device. It has a structural framework in which all the working parts are held and operate; but, even if the claims called for a chamber containing and retaining the staple in its

first, intermediate and final positions, defendant's device would respond. It has one closed side along which the staple is formed, and another closed side along which it is ejected. The two other sides of the head are only partly closed, but each is developed far enough to position and hold the staple at each end of its turn. It follows that during a part of its travel along the inclined guide the staple is exposed to view, but that the incasing member should fully incase these two sides is of no importance, and the greater parts of these sides of the incasing member have no function in the patented device. The fair meaning of the phrase is therefore satisfied by a member which incases, as far as incasing has any function, and it should not be construed to refer only to a member which completely incases on all sides.

[5] It is next urged that unless claim 2, and similar claims, are by construction limited to gravity means for turning the staple, they are void because functional, in that they attempt to cover the mere idea of revolving the staple by whatsoever means it may be accomplished, and reliance to this effect is had on Westinghouse v. Boyden, 170 U. S. 537, 568, 18 Sup. Ct. 707, 42 L. Ed. 1136. If it were attempted to make these claims cover complainant's modified device, in which the staple is being revolved as it is being formed, there would be greater force in the claim that so broad a construction would make them functional; but the construction which merely makes them reach defendant's present device is not open to that objection. The claims in suit clearly contemplate that there should be, first, a staple completely formed in one plane, then a pressure block for ejecting it from that plane and starting it on its way to the other, and then some means for guiding the staple into its final position as it is pushed or falls. This breadth of interpretation to the words "guiding means," not found in every claim, but necessarily implied in each of those in suit (since without such guiding means the device would not operate), does not extend them beyond the "convenient formula of the broadest equivalency of which the real invention permits," which extension we have thought was a test of whether a claim was invalid because functional. Davis Co. v. New Departure Co., 217 Fed. 775, 133 C. C. A. 505.

From this view it follows that claims 2, 3, 7, and 12 are infringed. Whether claim 9 so far implies the exclusive use of gravity for turning the staple as to exonerate defendant's form we need not decide. When all the claims are considered, those not sued upon, as well as those that are, it cannot now be important either to the injunction or to the accounting whether claim 9 is infringed, and we see no likelihood that any future possibly infringing structure will involve that question.

The decree below will therefore be affirmed, except as to claim 9, which in the decree will be omitted from the enumeration of claims infringed. This modification will not affect the question of costs, which will be awarded against appellant.