### VENTILATED CUSHION & SPRING CO. v. D'ARCY.

(Circuit Court of Appeals, Sixth Circuit. April 4, 1916.)

#### No. 2627.

1. PATENTS ⬤⟞168(2)—CONSTRUCTION—ESTOPPEL BY PROCEEDINGS IN PATENT OFFICE.

An applicant, who acquiesces in the rejection of claims by the Patent Office on references to prior patents, and accepts narrower claims, is estopped from broadening such claims beyond the natural import of their terms, even though the examiner may have been wrong in insisting on the limitation.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 244; Dec. Dig. ⬤⟞168(2).]

2. PATENTS ⬤⟞170—CONSTRUCTION—COMBINATION PATENT.

Although all of the elements of a patented combination are not found in a single structure in the prior art, so as fully to anticipate, in determining the scope of the patent and its place in the art, as affecting the question of infringement, prior patents, showing separate elements of the combination, may properly be considered.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 245; Dec. Dig. ⬤⟞170.]

Appeal from the District Court of the United States for the Western District of Michigan; Clarence W. Sessions, Judge.

On petition for rehearing. Denied.

For former opinion, see 229 Fed. 398, —— C. C.-A. ——.

William R. Rummler, of Chicago, Ill., and Luther V. Moulton and Cyrus W. Rice, both of Grand Rapids, Mich., for appellant.

Fred L. Chappell and Chappell & Earl, all of Kalamazoo, Mich., for appellee.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

PER CURIAM. The grounds urged in support of the petition for rehearing, so far as it is necessary to notice them, are hereinafter mentioned.

1. Counsel say of our reference to Murray's patent of 1885, No. 324,335, that we were mistaken in stating that Murray "employs inverted conical springs with a short spring disposed within each of the long springs." The supposed mistake consists of an omission to call

attention to the further fact that the short springs are there stretched and held, as counsel say, in an "extended position so as to be of the same length as the other springs when the structure is completed." This feature of the Murray patent is of no importance in determining the pertinency or effect of the reference. The contention in this behalf concedes, and of course must concede, that the short springs are disposed within the long springs; but the feature of stretching the short springs beyond their normal length and to that of the long springs, where their upper ends are fastened together, was for a purpose distinct from the object of the reference. This will be seen, as also the relevancy of the feature referred to in the opinion, upon reading the following portion of Murray's specification:

"When pressure is brought to bear on such a seat (Murray's patented device), the small springs at first assist it to depress the large springs until the small springs reach their normal form. Then if the pressure be sufficient to continue descending, the small springs resist compression and assist the large ones to carry the load."

The idea of associating long and short springs for the latter of these two declared purposes is to be read in connection with Murray's further idea that the long and short springs might, as pointed out in the opinion, be separately disposed; and if these two disclosures did not anticipate Stotts' purpose of associating long and short springs, the effect of such disclosures was certainly to limit the scope of his patent, for Stotts declared in his specification that one of his "main objects" was—

" * * * to provide a cushion structure in which the resistance of one set of springs is reinforced by a second set after the first set has yielded to a certain extent, thus adapting the device to use for persons of either heavy or light weight."

2. It is urged that the court misapprehended the "controlling fact that in the device shown in the patent in suit, as well as in defendant's device, a supporting base exists even when the short springs are removed." This contention, so far as it relates to the patent in suit, ignores the essential features of Stotts' supporting base. To remove the short springs would in effect be to contradict Stotts' plan of a supporting base, whether that plan be sought in the contents of the file wrapper or in the letters patent. The reasons for these views sufficiently appear in the portions of the opinion which treat of the limitations imposed by the prior art, and also by what transpired in the Patent Office before the contested claims were allowed. We may, however, add that the model presented by appellant to illustrate and support the petition for rehearing serves to confirm us in our original conclusion touching the effect of omission of the short springs. This model omits those springs and, of course, the fastenings which were intended to secure the bottom convolutions of adjacent long springs to those of the short springs and so in vital part to form the supporting base in question. It is not open to appellant to say, as its counsel in effect assert, that this unitary method of construction can be abandoned without affecting the supporting base; nor will it do to say, as counsel contend, that the terms used in the claims in suit were intended as mere "descriptive phrases." The effect of adopting counsel's theory

would be to disrupt the supporting base, and also, through violation of essential portions of their very terms, to broaden each of the claims in suit. Such a theory as this amounts to an insistence that Stotts could have secured, in addition to his claims as allowed, also another claim which would have called only for the parts embraced in the model before alluded to; in other words, that he could have secured a claim omitting the short springs and the fastenings between their bottom convolutions and those of the adjacent long springs (see Fig. 3 and also explanation thereof as shown in opinion).

[1] It must be remembered, however, that what transpired in the Patent Office necessarily included not only the examiner's interpretation, but also Stotts' own understanding, of the references on which the examiner relied for rejecting Stotts' claims. It could make no difference if they were both wrong in their views concerning the references (though it is not intended to intimate that they were); for Stotts' acceptance of the claims and subsequent acquiescence therein plainly operate to estop both him and the appellant from broadening the claims beyond the natural import of their terms. This feature of the case falls well within the principles of the decisions contained in the opinion respecting the effect of Stotts' course as it is disclosed by the file wrapper; and to those citations we may add the following decisions of this court: Thomas v. Rocker Spring Co., 77 Fed. 420, 430, 431, 23 C. C. A. 211; Campbell Printing Press Mfg. Co. v. Duplex Printing Press Co., 101 Fed. 282, 295, 41 C. C. A. 351; American Stove Co. v. Cleveland Foundry Co., 158 Fed. 978, 983, 86 C. C. A. 182—and the rules laid down in W. W. Sly Mfg. Co. v. Russell & Co., 189 Fed. 61, 64, 110 C. C. A. 625, although the facts there involved, unlike the facts here, rendered the rules stated inapplicable to that case.

3. It is contended that the court misapprehended the wording of the claims. It was not deemed necessary to set out in the opinion more than the first claim and also the differences of importance between that claim and the other claims involved; but counsel think the differences so pointed out are erroneous as to claims 2 and 6. We need not repeat what is shown in the opinion as to how the second claim escaped amendment. What is there said renders counsel's allusion to an omitted phrase unimportant. The criticism made in relation to the sixth claim is reducible to a difference of words employed in that claim and in the first claim to describe how the bottom convolutions of the long springs should be connected with the bottom convolutions of the adjacent short springs; in the sixth claim these convolutions are to be "rigidly fastened" to one another, while in the first claim they are to be "in contact with and secured to" one another; counsel now insist that there is a distinction between these two methods of joining the bottom convolutions of long and short springs, of which we shall have something to say later; but they do not allude to what was said in respect of the supporting feature of the patented structure in another portion of the opinion, which is as follows:

"In claims 1, 9 and 10, this is called a 'wire net-work base,' while in claim 2 it is called a 'supporting-base for said springs,' and in the sixth claim 'a stiff supporting-base of wire net-work.' It is to be remembered that this support, regardless of the names applied to it in the claims, consists of the bot-

tom spring-convolutions, the lower border-frame, the braces, and the contrivances used to connect and hold these parts in place."

When the method adopted in the opinion for describing the claims is read in connection with the parts here brought into contrast, the difference, if there be any of importance, between the fastenings called for by the first and the sixth claims, so far as their supporting bases are concerned, might, we think, be readily discerned—especially for all purposes of testing their scope and effect with respect to the prior art and the contents of the file wrapper.

4. It is insisted that the court misapprehended the difference in operation between the patented device and the devices of the prior art. It is in substance said that the depression of the cushion by a load "will cause the short springs at each side of the center of depression to be tilted so that when the load reaches" the short springs "they will be positioned to receive the thrust more nearly in alignment with their axes," and that this is due to the resilience of the supporting base. The attention of witnesses was called both to the mounting and operation of the patented device, and explanations were given both directly and through comparison with at least one or two other devices. The object seems to have been to show advantages of a wire base over those of a wooden one with respect to fastening the springs securely, to avoid breakage and displacement of their support, and to supply ventilation through openings in the wire base. Naturally if the witnesses had regarded this so-called tilting quality as of any practical importance they would have been asked also to explain its advantages. The tilting feature, however, seems to have originated with counsel for appellant. It first appeared here in appellant's reply brief which was filed prior to the hearing, and has been strenuously urged in support of the petition for rehearing. Counsel have placed their chief reliance, as we understand them, upon a clause of the specification and the omission of the top frame *10* (see Fig. 1 shown in opinion) of the short springs from the claims in suit. It is stated in the specification:

"It will be seen that the base convolutions of the springs, the base frame *4* (the lower border frame), and the cross-wire *6* (the braces) together with the fastenings of each to the other, form a rigid base for the cushion. This base is, however, all constructed of resilient wire and is therefore capable of yielding to a certain extent."

Although it is there said the base is composed of "resilient" wire, it is also said the base is "rigid." Further, in his written response to the letter of the patent examiner showing the references upon which the first rejection of claims was based, Stotts said: "A stiff base is important, and it is of advantage to have such base of open network so as to provide for more complete ventilation, as in the so-called ventilated cushions for which applicant's device is particularly adapted." Granting then that the claims in suit should as counsel insist each be read with reference to the feature of the specification which states that the base is capable of "yielding to a certain extent" (National Tube Co. v. Mark, 216 Fed. 507, 515–517, 133 C. C. A. 13 [C. C. A. 6th Cir.]), and having in mind also the omission of frame *10*, still, we cannot think that the tilting quality now claimed is more than

theoretic; we certainly do not discover that any such quality was designed by Stotts, nor are we able to see that the quality is sufficient, to constitute any substantial operating characteristic of the patented device. It follows that the contention of counsel that the assumed tilting quality is to be regarded as an element of the combinations grouped in the several claims, and as distinguishing them from the prior art, cannot be sustained. It results, too, that the argument presented to show infringement of the sixth claim by reason of the "stiff supporting-base" there called for must fail. Although ingeniously put, the logic of the argument leads to a range of equivalents that is forbidden by the prior art; for in the absence of an effective tilting quality the theory of a *stiff-resilient* base, which is in effect contended for, comes to be a substitution of a metal base for a wooden one. The case is therefore unlike that of Diamond Rubber Co. v. Consol. Tire Co., 220 U. S. 428, 433, 31 Sup. Ct. 444, 446 (55 L. Ed. 527), cited by counsel. In that case the "tipping capacity" of the tire was shown by testimony. For example, Mr. Justice McKenna said:

"In other words, and in the language of one of the expert witnesses, the tire has the capacity to rise and fall and reseat itself under lateral strain, that is, to rise slightly from the rim on one side, independently of the other, when subjected to very great strain, and immediately reseat itself when such strain is removed."

True, the tipping capacity of the tire which was there proved to exist was not mentioned in the specification nor made the subject of claim in the patent in suit; it is true, also, that the patentee's knowledge of the existence of the quality at the time he made his application was seriously questioned; but these matters were regarded as falling within the well-settled principle that the patentee was nevertheless entitled to the advantage of the tipping quality so established, since it was necessarily involved in the invention. This court has had occasion to apply this principle a number of times. Morgan Engineering Co. v. Alliance Mach. Co., 176 Fed. 100, 107, 100 C. C. A. 30, and citations; Jackson Fence Co. v. Peerless Wire Fence Co. (C. C. A.) 228 Fed. 691, 696.

[2] 5. It is said that the court "did not treat the combination of the patent as a unit." The theory is that failing to find in the prior art any unitary structure precisely like the one in issue, the court "segregated the elements" of the claims in suit, found each of the elements anticipated in some device of the prior art, and, contrary to the law declared in Bates v. Coe, 98 U. S. 48, 25 L. Ed. 68, concluded that "if there was any invention in plaintiff's device, it was in the specific base only." In the opinion we assumed, without deciding, the patent to be valid, and confined the inquiry to the scope of the invention. Clearly this was not to assume, as counsel seem to intimate, that there was invention in the *supporting-base alone*. However, as we interpret their theory, counsel do not distinctly state their purpose in citing Bates v. Coe. That was a case for infringement of a patent; and the defense, in addition to a denial of infringement, challenged the validity of the patent. The particular part of the opinion there rendered, upon which reliance is placed, concerns the charge of *invalidity* of the patent, and so is inapplicable here; and, indeed, nothing is there stated that is

helpful to the solution of the instant case.[1]   We infer, however, that the real purpose of referring to Bates v. Coe was, in the first place, to call attention to the statement, contained in the opinion, that the charge of infringement cannot be escaped by "proving that a part of the entire thing is found in one prior patent,   *   *   *   and another part in another prior exhibit, and still another part in a third one, and from the three or any greater number of exhibits draw the conclusion that the patentee is not the original and first inventor,   *   *   *"   and, in the next place, to conclude from this statement that the scope of the claims of a patent cannot be limited by the prior art, unless all the elements of the claims are found in a single prior patent.   It thus becomes plain that according to this theory plaintiff would be entitled to a construction of the contested claims which would forbid looking into the prior art for its effect upon one or the other of the two controlling sets of elements comprised in the claims; that is, either those of the supporting-base or those of its superstructure.   To illustrate, as pointed out in the opinion, Stotts associated in his supporting-base elements similar in point of equivalency to elements disclosed in metal bases of the prior art, with an arrangement of long and short spiral springs also disclosed by the prior art, without, however, producing a substantially new result.   If then, according to the "unit" theory urged by counsel, only one of the two sets of elements so group-ed in Stotts' device could be tested by the prior art (since both sets are not disclosed by a single prior patent), an advance in invention would result which in truth was not made.

In our judgment, however, it cannot be doubted that the question of whether any advance over the prior art is made in a patented device may be tested by two or more prior patents, which show as here that the device "is but one in a series of improvements all having the same general object and purpose."   Familiar illustrations of this may of course be found in decisions which, after reviewing patents of the prior art, accord to the claims in issue only a narrow construction, and frequently restrict them to the precise form of the device, or the fullest equivalent of that form, as it is described in the specification and drawings.   We may refer to some of the controlling decisions; for example, Mr. Justice Bradley said, in Bragg v. Fitch, 121 U. S. 478, 483, 7 Sup. Ct. 978, 981 (30 L. Ed. 1008):

"It is obvious from the foregoing review of prior patents, that the invention of Bristol, if his snap-hook contains a patentable invention, is but one in a series of improvements all having the same general object and purpose; and that in construing the claims of his patent they must be restricted to the precise form and arrangement of parts described in his specification, and to the purpose indicated therein."

Again, in Deering v. Winona Harvester Works, 155 U. S. 286, 291, 15 Sup. Ct. 118, 120 (39 L. Ed. 153), Mr. Justice Brown had occasion to say:

"Devices bearing certain similarity to this, and having in view the performance of a like function, were not wholly unknown to the prior art.   These

[1] See remarks of Judge Jenkins upon Bates v. Coe in Campbell v. Bailey (C. C.) 45 Fed. 564, 565, and also Keene and Pharis v. New Idea Spreader Co., 231 Fed. 701, —— C. C. A. ——, decided by this court March 17, 1916.

devices, though not claimed to fully anticipate the Olin patent, are important in their bearing upon the construction of this patent and upon the alleged infringement by the defendants."

See Gordon v. Warder, 150 U. S. 47, 50, 14 Sup. Ct. 32, 37 L. Ed. 992; Specialty Manuf. Co. v. Fenton Mfg. Co., 174 U. S. 492, 497, 19 Sup. Ct. 641, 43 L. Ed. 1058; Derby v. Thompson, 146 U. S. 476, 481, 13 Sup. Ct. 181, 36 L. Ed. 1051; Hoff v. Iron Clad Mfg. Co., 139 U. S. 326, 328 to 330, 11 Sup. Ct. 580, 35 L. Ed. 179; Computing Scale Co. v. Automatic Scale Co., 204 U. S. 609, 615, 27 Sup. Ct. 307, 51 L. Ed. 645.

Further argument is unnecessary; after careful consideration, we are convinced that the petition for rehearing must be denied.