CONCRETE APPLIANCES CO. et al. v. MEINKEN et al.

(Circuit Court of Appeals, Sixth Circuit. January 6, 1920. On Petition for Rehearing, March 2, 1920.)

No. 3241.

1. PATENTS ⬥61—VALIDITY AFFECTED BY PRIOR APPLICATION FOR ANOTHER PATENT.

A patent, applied for after filing of application for, but before issue of, another patent in the same art, should, as to anticipation and the presence of invention, be judged upon the basis of which the earlier application is a part, though it was not a part of the prior art, in the sense in which that phrase is used with reference only to publication.

2. PATENTS ⬥328—FOR DISTRIBUTING WET CONCRETE INVALID FOR WANT OF INVENTION.

The Smith patent, No. 948,746, for an apparatus for distributing wet concrete, as limited by the prior Callahan patent, No. 948,719, *held* not to show invention.

3. PATENTS ⬥328—COMBINATION DEVICE FOR DISTRIBUTING WET CONCRETE VALID AND NOT ANTICIPATED.

The Callahan patent, No. 948,719, for an apparatus for distributing wet concrete, consisting of an elevating tower and devices for spreading same over structure, though a combination, *held* to show invention, and not to have been anticipated.

---

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

4. PATENTS ⬡⟹27 (2)—DOUBLE USE.
   Apparatus for elevating and distributing wet concrete *held* not a mere double use of earlier apparatus for loading coal.

5. PATENTS ⬡⟹26(2)—NEW RESULT.
   The elevation and gravity distribution of wet concrete to and around the successive floors of a building being constructed, and all in a semiautomatic way, is a new result in a patentable sense.

6. PATENTS ⬡⟹25—AGGREGATION.
   Apparatus designed for what is in a fair sense a unitary work does not become an aggregation merely because it involves successive steps under manual control.

### On Petition for Rehearing.

7. PATENTS ⬡⟹328—PATENT FOR DEVICE FOR ELEVATING AND DISTRIBUTING CONCRETE CONSTRUED.
   The Callahan patent, No. 948,719, for an apparatus for elevating and distributing wet concrete to the floors of buildings under construction, one of the features of which is a horizontally movable boom adjustably connected with the tower and adapted to be arranged at various positions in the height thereof, *held* not limited to horizontal adjustability of the boom, nor to a tower built section by section as the building progresses.

Appeal from the District Court of the United States for the Western Division of the Southern District of Ohio; Howard C. Hollister, Judge.

Suit by the Concrete Appliances Company and another against Dietrich Meinken and others. From a decree for defendants, plaintiffs appeal. Reversed and remanded, with directions.

Suit upon patents numbered 948,719, issued February 8, 1910, to L. Callahan, and 948,746, issued February 8, 1910, to A. L. Smith. This case involves the tower apparatus now in common use for elevating and distributing wet ("mush") concrete upon the successive floors of high buildings, constructed in whole or in part from that material. The apparatus, as now used, involves two steps: First, elevating the material to a reservoir or hopper bin temporarily fixed at the desired elevation in the tower; and, second, distributing it from that elevation, by gravity, through a conduit revolving at the point of connection with the hopper bin and having at least one swiveled elbow joint, whereby any desired point upon the selected horizontal plane can be reached for the gravity discharge of the material.

Callahan and Smith each showed, in his drawing, the complete apparatus; but Callahan made no claim to the feature of the double swiveled discharge pipe. Callahan's application was filed January 21, 1909; Smith's on February 23d of the same year. The Patent Office notified Callahan that his application seemed to conflict with another, and suggested to him some of the claims which Smith had made. Callahan adopted these claims, whereby an interference was declared. The substance of the issue is shown by count 1, which is given in the margin.[1] Upon this issue, Callahan conceded priority; judgment was rendered upon the concession; Callahan canceled these additional claims; and both patents issued. Both patents, by assignments, licenses, etc., became the property of the Concrete Appliances Company and Insley, and this suit was brought by them in the court below based upon alleged infringement of both patents. The above-quoted count 1 of the interference became claim 1 of the Smith patent, and is typical of those sued upon.

[1] "In a device for distributing concrete, means for elevating the concrete to a point above the work to be performed; a hopper adapted to receive the concrete so elevated; a primary distributing pipe revolubly mounted beneath the hopper; and a secondary distributing pipe revolubly mounted beneath the mouth of the first named pipe, substantially as described."

Claim 5 of the Callahan patent is here quoted,[2] and may be accepted as a statement of his invention said to be infringed. Claims 1, 2, and 13 are also declared upon.

Arthur M. Hood, of Indianapolis, Ind., for appellants.
F. E. Dennett, of Milwaukee, Wis., for appellees.
Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

DENISON, Circuit Judge (after stating the facts as above). [1, 2] It goes without saying that the Smith patent can get no advantage merely because it has been owned and commercially exploited along with the Callahan patent. Upon this record, Smith cannot claim to be the inventor of anything shown by Callahan's application, except as the latter is modified by the later concession of priority. The Callahan patent is not a part of the prior art, in the sense in which that phrase is used with reference only to publications, but the Smith patent, both as to anticipation and as to the presence of invention, must be judged upon the basis of which the earlier Callahan application is a part. Lemley v. Dobson-Evans Co., 243 Fed. 391, 156 C. C. A. 171. It must therefore be assumed, as against Smith, that the advance of his claim 1 consisted merely in taking the concrete elevating and distributing apparatus of Callahan and substituting for Callahan's simple discharging conduit, revolving only at the point of attachment to the receiving hopper, the compound discharging conduit consisting of two or more sections revolubly connected with each other.[3] We are not convinced that this advance involved any invention. Such a double swiveled conduit was a well-known expedient for the gravity conveying of any material which it was desired to discharge at selected points in a lower horizontal plane. It is obvious—at least when it is pointed out to us—that, with an inclined conduit revolving at its upper end, the lower end could be made to reach any desired point on the lower plane, either by changing the angle of inclination and modifying the length of the conduit, as by telescoping a section, or by adding a supplementary conduit revolubly connected with the lower end of the primary one. Neither form had been in use for concrete (before Callahan), but both forms were old for other purposes. The double swiveled form had been most highly developed in grain elevators, for distributing the grain from the elevated receiving bin to the several openings on the floor below, which indicated spouts leading to still lower storage bins.

If the matter were to be considered in the broadest sense, there

[2] "Claim 5. An apparatus for the purpose described, comprising a tower, a conduit extending laterally therefrom, a suitably supported horizontally movable boom carrying the conduit, said boom being adjustably connected with the tower and adapted to be arranged at various points in the height thereof, means for raising plastic material to the point desired in the height of the conduit [tower], and means for receiving plastic material from the raising means and conducting the same to the conduit; the said receiving and conducting means being adjustable in the direction of the height of the tower."

[3] We speak thus of Callahan's form, because of the necessary effect of the filing dates, the concession, and the form of the issued claims.

might be such distinctions between elevating and distributing grain and elevating and distributing concrete that transferring a device from one art to the other and making the necessary adaptation would involve invention. That need not be decided; but here Smith begins at the point where the elevation of the concrete is finished. He has then merely the question of gravity distribution. He finds that concrete has been distributed and grain has been distributed by a single unitary chute, swinging and turning at its upper end, and that grain has also been distributed by the double swiveled chute, thereby increasing the ability to select exactly the desired point for discharge. In the words which were used in Crown Co. v. Sterling Co., 217 Fed. 381, 133 C. C. A. 297, Callahan had already "bridged over whatever gap there was" between the art of concrete building and the art of gravity distribution, and the "door of opportunity was open" to all who wished to use in the former art an expedient well known in the latter. It seems to us quite clear that there is no invention in adding to the device of Callahan the well-known additional swiveled joint in the discharge conduit. It follows that those claims of the Smith patent sued upon are invalid, and the decree of the court below, which dismissed the bill as to this patent, must so far be affirmed.

[3] At the time these patentees appeared on the field concrete had already come into extensive use as a building material in connection with metallic reinforcements, and it had been found that it was suitable for buildings of all shapes and of many stories in height. When mixed of the proper consistency, it was called "mush" concrete, and to handle this material and deliver it efficiently at the place of use in a large building operation was a considerable problem. Various methods had been employed, but the one most approved consisted in raising it by elevator to the floor or level where it was to be used and there dumping it into wheelbarrows, by which it was conveyed to the various desired points of use upon that level. It occurred to Callahan that he could construct a tower, or skeleton elevator shaft, which should originally extend, or which, by successive additions, should be made to extend, well above the highest story of the proposed building; that he could attach to this tower, and make vertically adjustable thereon, a receiving bin or hopper carrying a downwardly inclined and revolubly connected discharge chute, which could be swung about to reach various points on the next lower level to that where the receiving bin was fixed; that this receiving bin and its discharging apparatus could be temporarily fixed, as the building advanced, at positions on the tower suitably elevated above each successive story; that the mush concrete could be elevated inside the tower to these various fixed positions and there dumped into the receiving bin; and that, in this way the mush concrete could be delivered in an approximately automatic way throughout the successive floors or levels of a building, no matter how high. Upon this record, this general thought was wholly novel. It has proved to be of great commercial value. It is common knowledge that, mostly within the period since the patent issued, reinforced concrete has largely superseded all other materials in the erection of large structures, and the

record shows that 80 or 90 per cent. of all the important construction work of this class in the country employs this Callahan method, and that all of the larger manufacturers of machinery and apparatus for this general purpose have taken licenses under the patent. It is not too much to say that the invention has played a large part in revolutionizing the building industry, and that it is not common for a patent in litigation to find itself supported by such a large measure of commercial merit and public acquiescence.

It is not contended that the patent is anticipated, in the strict sense of that term, but the defendant's position, approved by the court below, is that Callahan only put together old and familiar elements, and that his advance did not involve invention over what had gone before. To determine this question, we must know, first, the character of the relations between what was old and this new arrangement; and, second, whether his claims are properly characterized by reference to his real advance. To elevate material to a fixed and invariable height, and to distribute it therefrom by gravity, through a swinging, revolving chute, to different discharge spots upon a lower level, was common. As we have said, in considering the Smith patent, this was familiar in the class of grain elevators. The typical so-called grain elevator, or storage house, was a permanent structure, and grain was carried by various types of elevating apparatus to the permanent top floor or level. From the bottom of the bin there situated depended a swinging chute, which could be moved about so as to discharge, upon the floor below, into any storage bin opening from that level. These grain elevators, like others of similar type shown by the record, entirely lack the only substantial novelty claimed for Callahan. They did not have a temporary receiving bin or hopper with a connected discharge chute vertically adjustable in an elevator tower, adapted to distribute the material upon successive levels. If invention lies in this thought and its practical application, the grain elevators are not important.

Next we are cited to several examples of unloading apparatus for vessels, of which the English patent to Baillie, No. 10,380 of 1888, is as relevant as any. In this device, which was for transferring coal from a barge to the ship alongside, there was a receiving bin or hopper located in an elevated framework or staging on the barge, and from which a depending chute carried the material away by gravity to the proper bunker in the ship. The coal contents of the barge were raised to this point by an endless chain of buckets over an inclined mast or support pivoted to the vertical frame at its upper end. Evidently, as the contents of the hold of the vessel became lowered, this mast must be extended further down, or further to one side, and this could be done either by an extension of the lower end or by lowering the upper pivoted point. The patent shows both methods of adjustment. The bin and pivot could be lowered upon this supporting stage a short distance—not more than the height of the bin. The point of final delivery was not changed. Such vertical adjustability as there was in the bin was incidental to raising and lowering the whole "tower" to accommodate it to the point where elevation be-

gan. We do not find here any substantial disclosure of the real novelty of Callahan's invention, as above stated.

This leaves for consideration only the patent to Theiss et al., No. 866,166, of September 17, 1907. It is not to be doubted that this is suggestive of the idea and the apparatus of Callahan; whether it is more than a mere suggestion is the question. Theiss' apparatus, like Baillie's, was intended for unloading coal from a barge and loading it into the hold of a ship. It consisted essentially of a tower-shaped structure permanently erected upon the deck of a barge or scow. It was intended to reach a distance substantially higher than the coal-receiving hatchways of the particular ship which might be selected to be served; there was never occasion to make it any higher. This tower carried an elevator car or skip which was loaded with coal when it was at the bottom of the tower, and then was elevated as far as necessary to be dumped into a receiving bin, which bin was capable of vertical adjustment on the tower. This receiving bin in turn dumped into a chute, which, at its lower end, discharged through the hatchway of the vessel to be loaded. This chute was not revolubly connected with the bin or tower. It could not be moved laterally. It was carried, by the tower, in ways or guides which gave the chute its inclination and permitted it to slide therein longitudinally. There was a permitted adjustment of the guide by which the angle of inclination could be changed, but this was done by releasing and readjusting and refastening the guideways, and could not be done as a part of the operation of the device while in use.

The adjustment and fixing of the chute, in order to discharge into a desired hatchway, was a complicated matter. First, the carrying scow must be so positioned and fastened with reference to the ship that the tower was exactly opposite the hatchway. Second, the receiving bin and the chute must be adjusted vertically in the tower at such a position that the chute, in its carrying guides, would be pointed at the hatchway. Third, the chute must be slid downward and outward, in the direction at which it was pointed, until its lower end entered the hatchway. If, then, it was next desired to reach another hatchway on the same transverse line, the vertical adjustment of the bin and the chute carrier, and the aiming of the chute at the new hatchway and its longitudinal extension into contact therewith, must be repeated. If it were desired to reach hatchways further forward or aft, the scow and its entire apparatus must be released and floated alongside the ship to its new position. In the broadest sense, this patent shows a plan of elevating material to an adjustable vertical height, and from there distributing it by gravity to selected positions upon a lower level; but it shows this idea in a very rudimentary form. It would be practically useless, for the purposes now involved.

In details of construction and of claim reading, there is ample differentiation. Claim 5 of Callahan, above quoted, will not read on Theiss. A comparison of the Theiss apparatus with this claim shows: (a) That the Theiss apparatus is not "for the purpose described," in any restricted sense of that phrase. (b) That Theiss has a relatively short supporting framework, rather than a relatively high and

distinctive tower. (c) That, while Theiss has "a conduit," it does not "extend laterally therefrom," excepting in the most general sense. (d) That Theiss has no "suitably supported horizontally movable boom carrying the conduit," nor anything which approximates such a boom. (e) That, since he has no boom at all, of course he has no boom "adjustably connected with the tower and adapted to be arranged at the various points of the height thereof"; but it must be said that Theiss' conduit itself has this vertically adjustable connection with the tower. (f) The remaining elements of the claim are literally met well enough by Theiss, save for the distinction as to their use with plastic material.

[4] The question presented by Theiss seems not to be one merely of double use, because the structural differences are too great; but, if the physical resemblance were much closer, the defense of double use would be far from satisfactory. See Ansonia Co. v. Electrical Co., 144 U. S. 11, 18, 12 Sup. Ct. 601, 36 L. Ed. 327; Potts v. Creager, 155 U. S. 597, 606–608, 15 Sup. Ct. 194, 39 L. Ed. 275; Hobbs v. Beach, 180 U. S. 383, 390, 21 Sup. Ct. 409, 45 L. Ed. 586; Gold v. Newton (C. C. A. 2) 254 Fed. 824, 827, 166 C. C. A. 270. Certainly, the art of loading coal into a ship for fuel is not the same art as that of distributing wet concrete to a building structure; nor is the analogy very close. It is not at all certain, even if probable, that an experienced building engineer, considering methods of handling wet concrete for a skyscraper, would call to mind a coal-handling apparatus on a harbor scow. On the other hand, it impresses us as a bold and original thought that this material could be handled in this way. Distributing mush concrete through gravity chutes by one apparatus throughout the whole course of building obviously involved difficulties; it had never been handled by gravity chutes at all, excepting under simple conditions where these difficulties did not exist, and then, perhaps, had been done only on paper. On one side was the danger that it would adhere to the chutes and set and choke up the pipes, at least at the valves and gates; on the other side, the risk that the elements would disintegrate, and the water and the cement and the broken stone fall in separate strata.

Callahan's conception, that this material could be thus treated so as to deliver it from the ground all about the successive several floors of a high building and with practically no manual labor, except that involved in the story by story adjustment of the apparatus, involved, we think, inventive thought of a high order, when accompanied as it was by the devising of suitable apparatus to carry out the thought, which apparatus substantially differed from anything which had ever been constructed for any purpose, although every element was old. It is true, in a sense, that the Callahan device is produced upon the basis of Theiss' structure by substituting for the longitudinally sliding and extensible delivery chute of Theiss, the revolubly mounted chute of the grain elevators; but this is not the whole truth. Callahan built up his tower to a height never thought of by Theiss, and which Theiss could not have accomplished without capsizing his barge; and Callahan supplied a chute-supporting boom

attached to the receiving hopper and vertically adjustable with it, a feature which the grain elevators did not have and could not have used. He thereby laid the basis for adapting the structure to use fairly distinct from that of either a coal elevator or a grain elevator.

As upon every such question, there is no authoritative decision which compels one or the other conclusion. The doubtful inference is rather one of fact; but we select and refer to a few instances where invention has been found—by the Supreme Court or by this court—and the facts of which may well be thought to present no stronger inferences in its favor than do those of the instant case: Loom Co. v. Higgins, 105 U. S. 581, 590, 26 L. Ed. 1177; Hobbs v. Beach, 180 U. S. 383, 393, 21 Sup. Ct. 409, 45 L. Ed. 586; Expanded Metal Co. v. Bradford, 214 U. S. 366, 381, 29 Sup. Ct. 652, 53 L. Ed. 1034; National Co. v. Aiken, 163 Fed. 254, 259, 91 C. C. A. 114; Warren v. Owosso, 166 Fed. 309, 92 C. C. A. 227; Morgan Co. v. Alliance Co., 176 Fed. 100, 109, 100 C. C. A. 30; Ferro-Concrete Co. v. Concrete Co., 206 Fed. 666, 124 C. C. A. 466; International Co. v. Sievert, 213 Fed. 225, 129 C. C. A. 569.

[5] The test of the presence of invention in a new assembly of old elements is sometimes said to be whether a new result is accomplished. This is often not a helpful rule, because its application involves definition of the phrase "new result," and this opens the original difficulty. Within a narrow definition, every new combination of old elements gets a new result; but this is not the sense in which the phrase is rightly used as indicative of invention. The recent opinion of this court in Huebner Co. v. Matthews Co., 253 Fed. 435, 165 C. C. A. 177, illustrates this situation. The ultimate practical result at which the patentee and his predecessors aimed was to carry packages by gravity upon a runway from one place to another. The patentee was the first to accomplish this with such a degree of efficiency as to make the device commercially popular; but the same result, except in efficiency degree, had several times been reached before, and by apparatus so similar as to be superficially indistinguishable. The patentee had simply added the well-known and common mechanical refinements and expedients already used by others, even in the same art—e. g., he used roller bearings, instead of ordinary journal boxes—and we declined to regard this as a new result. We have no intention to depart from that line of our recent decisions [4] of which this one is typical; such refinements are not inventions. On the other hand, we recall no instance of combinations of old elements which has been held to produce "a new result" in a patentable sense and which better deserves that commendation than does Callahan's. The quasi automatic elevation and distribution of wet concrete under the varying conditions of progressive building and by a single apparatus was an entire novelty. No one had tried to do it; apparently, no one had thought of it; it was useful in a very high degree; and when we

[4] Berger Co. v. Trussed Co., 257 Fed. 741, —— C. C. A. ——; Edwards v. Dayton Co., 257 Fed. 980, —— C. C. A. ——; Van Dorn Co. v. Mathis Co., 260 Fed. 400, —— C. C. A. ——.

find a new result in this complete and extreme sense accomplished by a confessedly new combination—though of known means—we think both the purpose of the patent law and the rightful application of the decisions thereunder require that it should be awarded the merit of invention.

[6] We have stated our conclusion that the device of the patent is not an aggregation in the sense that it represents such a mere assembling of old elements as might have been made by the exercise of only ordinary skill. It is at least equally clear that the device is not an aggregation in the more technical sense of the word, but is rather a true combination. It is true that the use of the apparatus involves successive steps, and is at each of its stages under direct or indirect manual control; but in a fair sense the entire operation of elevating and distributing the concrete is a unitary thing. From the time it starts on its journey from the ground to the time it is deposited in the forms, its progress might well be automatic. There is clear distinction between this performance and that of the associated washing and wringing machines, discussed by the Supreme Court in Grinnell Co. v. Johnson Co., 247 U. S. 426, 38 Sup. Ct. 547, 62 L. Ed. 1196. In the latter case, both the judgment and the hand of the operator were involved, in submitting to the second operation the material which had finished the first; the juxtaposition of the two machines was a mere matter of convenience. In the present case, the operator can, at the most, only interfere to prevent the otherwise normal completion or second part of what is intended to be the unitary work; and even then his interference will only temporarily stay the normal action. We collected and commented on the decisions of the Supreme Court and other courts on this subject in Gas Co. v. United Co., 228 Fed. 684, 143 C. C. A. 206. Callahan's patent should not be condemned as an aggregation.

We do not overlook the fact that some, and perhaps a considerable portion, of the practical and commercial success has been due to the use of the feature covered by the Smith patent; but this does not detract from the patentable and inventive merit of Callahan's idea. An oscillating or swinging chute, even without Smith's secondary swivel, would make the primary distribution of the concrete throughout the floor or level, leaving the secondary and more accurate distribution to be accomplished by further means. We have held that the particular means adopted by Smith did not involve invention, and we can hardly say that much of the credit due to public use should be taken away from Callahan, because he had not himself adopted an improvement, and refinement which, however important to commercial success, was within the grasp of the men ordinarily skilled in the art.

We have considered claim 5. Claims 1, 2, and 13, also in suit, use more general terms and are superficially somewhat broader; but we think, in connection with the specification, they necessarily intend that the means for receiving the concrete from the raising means and taking it to the conduit are vertically adjustable in the tower. This may fairly be implied from the requirement that the material is to be

raised to a "suitable point" in the tower. It is then seen that all these claims involve what we have thought Callahan's meritorious invention, resting upon the successive story by story operation of the device. With this interpretation, they are not very different from claim 5, but should be treated as other expressions of the same thought in terms nominally of somewhat broader equivalency. These claims, also, should be considered valid.

Infringement is not denied.

The decree below, as entered, must be set aside, and the record remanded for a new decree, modified in accordance with this opinion.

## On Petition for Rehearing.

[7] The application for rehearing brings to our attention a matter not mentioned in the opinion. We selected claim 5 as the one most suitable for study, because it expressly incorporated those features in which we thought patentable novelty was to be found. One of these features was the horizontally movable boom carrying the conduit, and "being adjustably connected with the tower and adapted to be arranged at various positions in the height thereof." We assumed that this referred to a vertical adjustment of the boom in the tower. The assumption is now challenged, because it is said that the adjustable connection between the boom and the tower was that mechanism which provided for a horizontal adjustment of the upper end of the boom on a horizontal track (which defendant has not used), and that the provision for vertical change of the boom in the tower is not adjustability, but rather refers to a disassembling of the parts in one location and reassembling them in another. It is true that the specification refers to a horizontal adjustability, but we do not think that it is this capacity to which claim 5 refers—at any rate, this inference is not clear enough to justify limiting the claim to a comparatively unimportant detail. Such an inference is contradicted, both by the fact that this horizontal adjustability of the boom on the tower is made the special characteristic of a group of claims not in suit, and by the fact that the thought is stated in the claim in immediate connection with the reference to "various points in the height" of the tower, and after one reference has been made to the horizontal motion of the boom and the reference to that function apparently finished, while the draftsman turned to the thought of vertical change. It is true, also, that in the form of the invention shown in the drawings, and specifically described, the vertical change was to be made by taking out bolts, removing the horizontal platform, raising it, and bolting it again to a new position, and that this is not adjustability in the most precise definition. However, it is well within the sense in which the word is very often used, and we must define it as the patentee intended. For these reasons we adhere to the interpretation of the claim in this respect which the opinion assumed.

It is also true enough that Callahan specifically contemplated building his tower up section by section, as the building progressed; but this was a matter of preference. His drawing shows the completed tower,

permitting operation anywhere along its height, and observation of his plan of erection does not change our conception of the real disclosure.

In other respects, further review of the case leaves our stated conclusions unchanged, and the application for rehearing will be disallowed.