## CONCRETE APPLIANCES CO. et al. v. GOMERY et al.

(District Court, E. D. Pennsylvania. June 13, 1922. On Reargument, October 31, 1922. Supplemental Finding, November 6, 1922.)

### No. 2067.

1. **Patents ⬙328—948,719, for apparatus for hoisting and distributing concrete, held not infringed.**

The Callahan patent, No. 948,719, for apparatus for hoisting and distributing concrete, *held* to disclose patentable invention, on a prior adjudication to that effect.

2. **Patents ⬙327—Adjudication of validity by Circuit Court of Appeals binding on all District Courts.**

Within the limitation that no adjudication is absolutely conclusive on those not parties, but that every new litigant is entitled to his day in court, the time when the found validity of letters patent should no longer be regarded as an open question in a District Court is at least when such an adjudication has been made by a Circuit Court of Appeals.

3. **Patents ⬙246—Patent for combination not infringed by combination of fewer elements which accomplishes same results.**

Where the prior art contains, not only elements which may be combined, but also different combinations of those elements, a patent for a particular combination is not infringed by a combination of a less number of the same elements, which in functions and results is all that the patented combination is.

### On Reargument.

4. **Patents ⬙328—948,719, for apparatus for hoisting and distributing concrete, held not infringed.**

The sole merit in the structure of the Callahan patent, No. 948,719, for apparatus for hoisting and distributing concrete, consists in the introduction, as a feature of the apparatus, of a boom whose function is to support the conduit part of the combined structure, and the patent is not infringed by an apparatus which lacks that feature.

### Supplemental Finding.

5. **Equity ⬙385—Testimony taken out of order admissible in discretion of court.**

Whether the testimony of a witness who is called out of order, or after that line of testimony has been closed, should be admitted, is a question wholly within the discretion of the trial judge.

6. **Equity ⬙385—Admission of testimony taken, which is beyond the scope of permission granted, is discretionary.**

Admission of testimony taken, which is beyond the scope of permission granted to take additional testimony, is discretionary.

7. **Depositions ⬙98—Deposition taken on interlocutory motion may be admitted for trial purposes.**

A deposition taken in support of an interlocutory motion may be used for trial purposes, where pertinent to the issues, and where the witness was fully examined and cross-examined.

In Equity. Suit by the Concrete Appliances Company and William H. Insley against John E. Gomery and others. Decree for defendants.

⬙For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Hood & Schley, of Indianapolis, Ind., and Cyrus N. Anderson, of Philadelphia, Pa., for plaintiffs.

Sheridan, Jones, Sheridan & Smith, of Chicago, Ill., and Wm. Steell Jackson, of Philadelphia, Pa., for defendants.

DICKINSON, District Judge. This cause concerns letters patent No. 948,719, applied for January 21, 1909, and issued February 8, 1910, to Lee Callahan, for an apparatus for hoisting and distributing concrete.

One defense is the absence of invention. Whenever the patented thing is a construction the question often arises of whether it is the product of invention or merely of constructive skill. How near this border line the subject-matter of this patent is its juridical experience shows. One court before which the patent has been was not able to find invention; the other found it.

The patented thing with which we are now concerned is an appliance for use as an aid in large building operations. Given the thought of its use and the plan of its construction, all else may be done by the user. It is used in the building trade in operations of which concrete construction is a part. The cement must be brought to the place of the concrete construction in a condition in which it will "set." The first thought in the appliance is that of the utilization of the force of gravity. The cement is conveniently "mixed" on the ground. The concrete work may be placed far above it. When "mixed," it must be lifted to a height. This varies. It must thence flow to the required place. This shifts. These needs suggest the features which such an appliance must possess. They may be listed by paraphrasing the language of claim 5 (the most significant one in issue), enumerating its elements, although in a somewhat different order of statement and with additions. They are, together with appropriate support fastenings: (1) A mast or tower, to provide for a hoist; (2) a bucket, scuttle, or skip, in which to carry up the cement; (3) hoists, to raise and lower the bucket; (4) a hopper, in which to deposit it for distribution; (5) a pipe, trough, or other conduit, to conduct its flow; (6) provision for the hopper and the high end of the conduit being maintained at adjustable heights; (7) provision for a swiveled or goose-necked attachment of the conduit to the tower, so that the conduit would have freedom of movement of its discharging end both vertically and laterally; and (8) possibly a "boom" or other support for the conduit, in addition to its attachment to the tower.

Whether all these needs are obvious, and providing for them calls only for ordinary constructive skill, determines the question of invention. As every element named had long been used in kindred arts, and every one of them separately or in smaller groups in this art, it is manifest that invention could reside only in the novel thought of their use in combination. It is also evident that these needs and practicable provision to meet them would vary with the conditions under which the work was to be done, as the means of depositing the cement must be adapted to these conditions. The owner of any appliance for doing what was thus required to be done might sell it to the user, having

had it fabricated in parts, and assemble and erect it at the place of the operation, or he might license those in charge of the operation to make and erect it, thereby selling to them the naked thought of its use, together with plans for its construction and erection. Indeed, the latter was what the owner of this patent at first did, disguising the sale of the use of the mere idea by providing a superintendent of construction.

Early in the more general use of concrete construction, what is called "dry cement" was favored. There was a pronounced prejudice against the use of the more liquid form now accepted. It took time to overcome this prejudice. The introduction of "reinforced concrete" and the greater facility in handling cement when "wet" probably caused the preference for "dry" to be yielded and the prejudice against the "wet" to be abated. The increase in the volume of the cement used also, of course, contributed. This prejudice still lingers, and as long as it was general the "gravity" method of distribution was little used. When the "wet" concrete came into general use and the operation was a large one, the "gravity" method was feasible and practically necessary. Some of the appliances were the veriest makeshifts. "Chutes" were in common use. They must, of course, be supported. Halyards, "horses," "trestles," "false work," "cross yards," and all kinds of supports, including, as is claimed, even "booms," were used. The methods of handling the cement adopted, and the means employed, were suggested, if not dictated, by the conditions with which the builder was forced to cope.

In such a state of the art, to give a monopoly of any one method is fraught with danger of injustice. A builder might be obstructed in his choice of methods which were open to all, or he might find himself shut out from the use of one which had been in use. Indeed, this is the very situation which is the basis of the defense now made. The defendants and other builders in sympathy with them resent as an injustice that they are charged for the use of a method of doing concrete work which would be adopted by any one who had the work to do without any hint gathered from this patent. The practical importance to them, and through them to the owners of buildings, is attested by the fact that when the plaintiff charged merely for the use of the ideas behind his appliance, the license fee demanded was on the basis of the surface area of concrete laid and was 10 cents a yard. The charge now made for the use of the constructed appliance is $3,500. If what is thus charged for is what any competent builder would do without the aid of any suggestions from the patentee, the sum demanded is a tax. If, on the other hand, however, the plaintiff's appliance is the product of patentable invention, the right to use it is the property of the patentee.

[1] This brings us to face the question of invention. Right here the defendant is confronted with the ruling by the Circuit Court of Appeals for the Sixth Circuit, the supplementary opinion supporting which is reported in Concrete Appliances v. Meinken, 262 Fed. 958. How far is the question still an open one for a trial court to determine? The res adjudicata doctrine, of course, does not apply, because

the present defendant was in no sense a party to that cause. At least some, however, of the very questions which now arise were determined in that case, with all before that court which is before us. One was the question of invention, and the other of novelty, as affected by prior patents and previous publications only. There is, or at least there is claimed to be, evidence of the state of the prior art and of anticipation by prior use, which was not then before the court.

[2] A patent right is a property right, in respect to which the validity of the grant is analogous to a good title to other property. The thought of a right in any one to property to which he has not a good title cannot be entertained. There is a contradiction in terms. So, likewise, there is no property right in any real sense in a patent which is of validity in one district or circuit and not in others. Letters patent give only the right to assert a property right, and are barely, if anything, more than prima facie evidence of it. The mere grant of letters can, for obvious reasons, be given no greater effect than this. An adjudication of validity in one case by a trial court is binding upon another in a suit upon the same patent only so far as the rulings made are of persuasive force. This limitation of its effect is likewise necessary. There must, however, come a time when an adjudication of validity must be recognized as binding, not only upon parties and privies, but in all other suits. This does not mean an absolutely conclusive finding, because every new litigant must be accorded his day in court; but it does mean that the finding of validity will not be disturbed merely because the court before which the later case is heard differs in opinion from the courts which made the earlier adjudications. There must be, in the later case, something which would not merely justify and support a different ruling, but something which compels it. The time when the found validity of letters patent should (within the limitation mentioned) no longer be regarded as an open question is at least when such an adjudication has been made by a Circuit Court of Appeals. If such an adjudication is properly to be questioned, it should be by a court of not less than like jurisdiction and equal authority.

These views call upon us to accept the finding of invention, and that the inventive thought embodied in plaintiff's appliance is absent from the patent applications cited for reference. This brings us to the question of anticipation, evidenced by prior uses not before brought to judicial notice. The ruling which we deem to be authoritative disposes of the effect of the proceedings in the Patent Office affecting the applications as to which an interference was declared, because these proceedings were before the court which made the adjudications. Respecting the newly evidenced prior uses, they are not in themselves of the character which show that what Callahan has been found to have invented was anticipated by the invention of another. Indeed, anticipation in a construction of this kind can never be shown with that clearness which will defeat a patent. All such structures are ephemeral, and no record is ever kept of what they are. The real significance of prior constructions is in their showing such a state of the art prior to the entry of Callahan as to forestall any finding of invention in what he did, or at least to take from him the credit of being the pioneer,

which (in the absence of this evidence) the Court of Appeals for the Sixth Circuit found him to have been. The inference is justified that, if that court had denied him the credit given, .its finding would not have been what it was. This is because of the emphasis given to the finding that he was such pioneer.

We are not persuaded, however, that the evidence before us so far differs from the evidence in the former case as to compel a different finding from that then made. We feel, however, that defendant has a right to the expression of our conviction that, had such finding of invention not been made, the evidence before us bearing upon the prior state of the art would have led us to the conclusion that no invention is disclosed by plaintiff's appliance, at least further than to confer upon him the right to a patent limited to the specific special construction which the patentee devised.

[3] The final question is that of infringement. Here we are on new and different ground from that trod by the parties to the other cause. This question is before a court for the first time. Accepting the finding of invention already made, which we have accepted and do now accept, the question is whether the invention thus found has been encroached upon by this defendant. The fifth claim defines the right found to belong to the plaintiff. The invention there described is made up of a number of elements, every one of which had been found to be old. This finding is in practical effect binding upon us, and without it would be made by us. Invention and novelty must therefore be in the combination. The "boom" feature or element is the keystone of the arch of this combination. It is to be found, not merely in the claim and in the application, but also in the drawings and in the constructed appliance, which embodied the invention claimed. Plaintiff advances and relies upon two propositions, neither of which we are able to accept. One is that the two elements of conduit and supporting boom do not mean two integers or units, but that the conduit itself may be both, if it is both a conduit and a boom. This has not been found to be, nor do we find it to be, the meaning of the claim. The boom element is a boom "carrying the conduit." This ex vi termini means two entities—conduit and boom. There are, not only functionally, but physically, two elements (among the others) in the combination. If the boom is made to also serve the purpose of a conduit, or the conduit of a boom, there is physically only one element, although it has a double function.

The other proposition comes in practical effect to this: That if an inventor goes to the prior art, and takes therefrom five elements, which he puts together in a combination constituting a patentable invention, and another man goes to the possession of the same art, and takes therefrom four of these same elements, of which he makes a combination, thereby creating an appliance which will serve the same purposes, and do all the work of the first, and do it equally well, the two appliances are in a patentable sense the same. They are not. The invention is not in the elements, nor in any one or more of them, but in the combination, and the combination is not the same, but a different one. The inventions are likewise not the same, but different inventions.

The counter proposition which we advance is not in conflict with the doctrine of equivalents, nor with the long line of cases to which we have been referred, which hold that a defendant cannot escape the charge of the infringement of a patented combination by devising an appliance which depends for its efficiency upon the presence of the patented combination, but in which he has incorporated added elements which play no part in the combination. It is clear that what he has done is nothing but an attempt to hide infringement, not to avoid it.

The proposition on which we rely goes to the length that the man who has access to an art, rich not only in known elements, which may be combined, but rich also in a number of combinations, and with the material thus supplied makes a new combination made up of a less number of elements than were before combined, and yet one which in functions and results is all which the earlier combinations are, has not only not infringed, but has made a distinct advance in the art. Of course, the statement of the proposition must be understood to mean nothing more or less than what is expressed. It does not mean that elements may be added which give no added function, nor that elements may be dropped so that the new aggregation may give some of the results of, and thus be a partial substitute for, the patented combination. In the former case infringement will always be found, and in the latter it may be found. When, however, as the proofs in the instant case show (what was not before shown), that those who practiced the art used appliances constructed of various combinations of these known elements, and all that the patentee did was to devise a special make of apparatus constructed upon the principle of a combination of a given number of these known elements, which has the merit of being a better appliance than those made up of fewer or other elements, all that the patent gives is a monopoly of that make of appliance. He cannot force the trade to use his superior make, nor levy tribute upon it for the use of appliances which are not his appliance, nor deprive the trade of the right before enjoyed of making appliances out of what the art supplied, so long as the appliances which were thus made are not his appliance, nor the equivalent of it.

Chute conduits were in common use. They had to be supported, or be constructed of sufficient strength to be self-supporting. Either was expensive, and otherwise open to objection. The thought of a "boom" to carry the conduit was an advance. In many respects the construction was a better construction. This, however, gave the inventor of the boom construction no property right in a self-supporting conduit construction, and he does not get the right by calling the conduit a boom. Of course, in a sense it is, and it may be that what this patentee invented was a conduit with the added functions of a boom. If so, however, this is not what he claimed, nor what was patented to him, and he gets, not what he invented, nor all which he invented, but only what was patented. The present plaintiff has no shadow of claim to more.

Our finding is that the defendant has not infringed, and that the bill should be dismissed for want of equity. The propositions of law upon which the ruling made depends are not in conflict with any of the cases to which we have been referred, including Capital v. National, 70 Fed.

709, 17 C. C. A. 355; International v. Brammer, 138 Fed. 396, 71 C. C. A. 633; McCormick v. Aultman, 69 Fed. 371; 16 C. C. A. 259.

The bill of complaint is dismissed, with costs to defendant. To give definiteness of date for appellate or other purposes to the decree indicated, it is not now made, but the draft of a formal decree to this effect may be submitted.

### On Reargument after Trial Hearing on Bill, Answer, and Proofs.

The defendants had in use at different stages of a construction job two different forms of appliances and apparatus for placing the concrete part of the work. The appliances and apparatus constitute in themselves each a structure. They are distinguished in this record as "defendant's apparatus" and "defendant's second structure." The special feature with which we are now concerned is what has been designated as a "boom." The word has been borrowed from the nautical art to express the special function which a part of the patented hoisting apparatus has. The primary function of a boom is to keep the foot of the mainsail or other sail extended. This gives the name. It incidentally, and indeed of necessity, is adapted to accompany, and in fact facilitate, prescribed movements. These features of a boom are so prominent that they have come to be regarded as its special and peculiar functions, and because of them the word has been carried into the art under present consideration. These functions are in this art merely incidental, although again necessary to be present.

The primary and real function is to support the conduit. It has an adjustable attachment to the mast, enabling it to be freely raised and lowered vertically; to be swung in any horizontal plane, or be tilted to any desired angle, but its real function is that above stated. If we have the right concept of the prior art structures and the advance made by the patentee, it was in the improvement made by providing a boom support for the chute or trough, down which the concrete was conducted when in its wet state. "Defendant's apparatus" was without this boom. Inasmuch as the opinion made no specific reference to "defendant's second structure," a formal reargument was allowed, in order to get the desired finding upon the record. The finding of infringement was intended to include both structures. The state of the prior art, as disclosed in the case of Concrete Appliances Co. v. Meinken (C. C. A.) 262 Fed. 958, was such that the court in that case found the patentee had made an advance in the art so marked and so meritorious that he should be deemed a pioneer.

The state of the prior art, as disclosed by the evidence in the instant case is such that it is confidently asserted a finding against the patentee should be made and the patent issued held to be of no validity. The ruling made in the cited case, however, we have felt to be controlling, and the reasoning by which reached, on the evidence before that court, convincing.

[4] The evidence presented now, however, compels the finding that the sole merit in the patented apparatus consists in the introduction, as a feature of the apparatus, of a boom whose function is to support the conduit part of the combined structure. "Defendant's apparatus"

made use of a self-supporting conduit. Many of the conduits before in use were, however, supported. A number (perhaps all) were supported in such a way as to prevent the free swing or movement of the conduit. Any support which has the characteristics of a boom support, and in that sense was an equivalent, would call for a finding of infringement. Any contrivance, however, would not be equivalent to a boom construction, merely because the two appliances had the supporting function in common. The patentee has no monopoly of any form of construction, unless it incorporated the boom support feature.

Our finding was and is that neither of defendant's structures or appliances in use contain as an element this boom feature. Halyards, topping lifts, braces, or the like, would, it is true, make of any trough or conduit (with the other features present here) a boom in a sense. None of these, however, would make a boom support in the sense in which the word is used in the patentee's application and claims, because there would be no conduit carried or supported by a boom, and none of the benefits of such a contrivance would be gained. This thought and these benefits make plaintiff's apparatus patentable, and to this it must be held.

The draft of a decree, as before outlined, may be submitted.

### Supplemental Finding.

We are asked to make a further formal additional ruling in this case. The requested ruling concerns the deposition of Charles W. Ellis, and covers the question of the general admissibility of any deposition, because evidence offered out of time and out of order; the question of whether the deposition as offered is within the scope of the motion to take additional proofs, and whether the testimony of the witness to which specific objections were made is admissible. We did not pass upon any of these questions, because the disposition made of the case rendered the whole of the deposition valueless. The parties, however, desire the ruling now asked for to be made, and we accordingly make it.

[5] Trials of equity cases are now assimilated to trials of actions at law when the courts sit without the assistance of the jury. In this view of it, whether the testimony of a witness who is called out of order, or who is called after that line of testimony has been closed, should be admitted, is a question wholly for the exercise of the discretion of the trial judge. We exercise that discretion in favor of opening the door to the admission of this testimony, so far as it is otherwise admissible.

[6] The second objection to the admission of the testimony, that it is beyond the scope of the permission granted to take additional testimony, is of like character with the first objection, and a like ruling is made thereon.

The objections, however, made to a number of the statements credited to the witness, on the ground that he was testifying to matters objectionable as hearsay, are sustained, and the testimony of the deponent as a witness in the cause is excluded, except as to these mat-

ters of which he showed a personal knowledge. In other words, the substance of the testimony of this witness is reduced to the proposition of fact that at the times of his visits to the various localities mentioned he saw in use the appliances and apparatus to which he referred, and the character of them, so far as he has described them, and to his negative testimony that, although in a position to have known it, he had no knowledge that the users of these appliances had paid a royalty or been licensed by the Concrete Appliances Company for such use. This negative statement goes only to the weight of whatever evidence there is in the cause that users of these appliances had so paid for the right to use them.

[7] We think the foregoing covers all the essential rulings worth while to be made with respect to this deposition. To follow the whole of the testimony, for the purpose of making specific rulings upon every objection made, would be almost interminable. There is, however, one other possible question, which we do not understand to be pressed. In case it should be, we make a ruling upon that also. It is substantially that a deposition taken in support of an interlocutory motion is not admissible as a deposition expressly taken for trial purposes. When, however, a witness has deposed just as he would have deposed, if the deposition had been in form for trial purposes, and he has been fully examined and cross-examined, we see no occasion to require him to give his deposition a second time, merely to cover this purely formal difference. A deposition so taken may be admitted for trial purposes as if, although taken primarily in support of a motion, it had been taken secondarily by anticipation as a trial deposition, to be accepted or rejected as the court should determine. We have so regarded and so treated this deposition.

An exception is allowed to the respective parties for every ruling now made, whether of admission or rejection of the testimony embodied in this deposition.